Argued at Pendleton October 30; reversed December 19, 1944;
rehearing denied April 3, 1945

# HUNTER *v.* CUNNING

(154 P. (2d) 562, 157 P. (2d) 510)

Before Belt, Chief Justice, and Rossman, Bailey, Lusk, Brand and Hay, Associate Justices.

*George H. Brewster,* of Redmond, and *A. S. Cooley,* of Pendleton, for appellant.

*R. R. Bullivant,* of Portland (De Armond & Goodrich, of Bend, and Pendergrass, Spackman & Bullivant, of Portland, on the brief), for respondent.

HAY, J.

This is an action by a real estate broker to recover a commission, in which plaintiff had a verdict and judgment for $29,062.50, with interest. The amended complaint alleged as follows:

Mrs. Emily F. Gilchrist Wells was the owner of a large tract of timber-land in Deschutes County, Oregon, comprising approximately two hundred million feet of merchantable pine, having a value in excess of $500,000. Her husband, Roe Wells, was her agent in the handling of her timber-land and in negotiating sales thereof. On or about October 15, 1938, Mrs. Wells and her said agent, by written agreement, employed the plaintiff Hunter to procure a purchaser for her timber-lands, or portions thereof, and agreed to pay him a commission of five per cent. During December,

1938, Hunter obtained an offer from Brooks-Scanlon Lumber Company, a corporation, (hereinafter called Brooks-Scanlon), by which it agreed to pay for said timber-lands $3.50 per thousand, upon an estimated stumpage of 180 million board feet of ponderosa pine, amounting to the sum of $635,000. He promptly transmitted this offer to Mrs. Wells and her said agent, in New York, and thereupon they rejected it. Notwithstanding such rejection, however, Mrs. Wells and her said agent continued negotiations with Brooks-Scanlon, and, on or about May 5, 1939, sold and conveyed the property to said corporation for the sum of $590,000, receiving at that time the sum of $100,000 in cash, the remainder of the price being payable in ten equal annual installments, evidenced by the buyer's promissory notes and secured by a mortgage upon the property. The sale was consummated solely through the employment and efforts of Hunter as the procuring cause thereof, and he fully performed his contract of employment, except that Mrs. Wells, in an effort to escape payment of Hunter's commission, prevented him from fully consummating the sale, by pretending to reject the offer obtained by him, and secretly, without his knowledge, effecting a sale of the property to Brooks-Scanlon, at a price and on terms substantially equal to or less than those negotiated by Hunter. Under the circumstances, he claimed to be entitled to a commission of $31,750 on the sale. Mrs. Wells died September 5, 1941, and the defendant, Max A. Cunning, is administrator of her estate in Oregon.

The defendant demurred, on the general ground that the amended complaint did not state facts sufficient to constitute a cause of action. The demurrer was overruled, and he answered by general denial, save

that he admitted that Mrs. Wells owned timber-lands having a value in excess of $500,000, which had growing thereon more than 400,000,000 feet of merchantable pine timber.

Plaintiff thereafter moved for permission to amend his amended complaint further, so as to allege that the property for which he was employed to find a purchaser was all of the timber-lands then owned by Mrs. Wells in the counties of Jefferson and Deschutes, in Oregon, or portions thereof, and that the offer which he procured from Brooks-Scanlon was to purchase a portion of such timber-lands, "said portion being known and identified as the 'South Tract' and comprising all the timberlands then owned by Emily F. Gilchrist Wells, in Township 17 S. R. 10 E. W. M.; Township 17 S. R. 11 E. W. M.; Township 18 S. R. 11 E. W. M.; Township 18 S. R. 10 E. W. M.; all in Deschutes County, Oregon," and that, at the time the cause of action herein involved arose, the plaintiff was a duly licensed real estate broker in the state of Oregon.

The court apparently made no order upon the motion to amend, and the case came on for trial. At the opening of the trial, plaintiff was permitted to amend his amended complaint, by interlineation, in the respects above mentioned, and, at the conclusion of taking of testimony, but before the cause was submitted to the jury, by leave of the court, over defendant's objection, he was permitted to file a second amended complaint, substantially in the language of the amended complaint, as amended by interlineation as aforesaid. It was stipulated that the defendant's demurrer to the amended complaint, and the court's ruling thereon, should be considered as applying to the second amended

complaint also, and, further, that defendant's answer to the amended complaint should be considered as his answer to the second amended complaint.

It appears from the evidence that Hunter has resided at Bend, Oregon, since 1902, and for about thirty-eight years has been engaged in the business of cruising and selling timber. In February, 1938, he wrote Mrs. Wells, asking permission to try to interest one Miller in the purchase of a portion of her timber-lands. Correspondence followed, between Mrs. Wells and her husband, Roe Wells, assuming to act for her, on the one hand, and Hunter on the other. Thereby, Hunter was authorized to, and did, negotiate a sale of some 2,000 acres of timber-land to Hitchcock Lumber Company, in respect of which Mrs. Wells agreed to and did pay him a commission of five per cent on the sale price. The Hitchcock sale was consummated October 15, 1938. Hunter was not licensed as a real estate broker in Oregon at any time covered by the various transactions in this paragraph mentioned, until December 5, 1938. Further correspondence followed, by which Hunter was authorized to find buyers for all or portions of Mrs. Wells's remaining timber-land in Oregon, it being agreed that, upon consummation of any sale at a price and terms satisfactory to Mrs. Wells, she would pay him a commission, as and when the sale price was received by her, at the same rate as was paid in the Hitchcock sale. He was not given an exclusive agency. On November 17, 1938, Hunter telegraphed Roe Wells that Brooks-Scanlon had approached him requesting that he should procure quotations of price and terms on the entire Wells timber holdings, and also on the south block and north unit separately. On November 23, 1938, Wells wrote Hunt-

er, giving the requested prices and terms. On December 2, 1938, Hunter notified Wells that the Brooks-Scanlon officials at Bend had informed him that they would recommend to their directors that the company purchase the "south block" at a price of $3.50 per thousand on an estimated cruise of 180,000,000 feet, (which would aggregate $633,500, considerably less than the quoted price, which was $857,668), terms to be as in the Hitchcock sale, with five years to cut and pay for the timber. Apparently Hunter thereupon took immediate steps to procure a real estate broker's license, which was issued to him on December 5, 1938, and in due time he procured a license for 1939 also. On December 7, 1938, Roe Wells countered Brooks-Scanlon's tentative offer, by a quotation of $725,000, on terms of $100,000 cash, balance to suit purchaser, with interest at three per cent per annum on deferred balance, purchaser to pay taxes. On December 9, 1938, in response to a telegraphed inquiry from Roe Wells as to the status of the deal, Hunter telegraphed Wells that the Brooks-Scanlon officials had given him a written memorandum to the effect that they would recommend to their directors a purchase of the property at a price of $635,000, $75,000 cash, balance in seven equal semi-annual installments, without interest. Seller to pay taxes. On December 10, 1938, Wells rejected the offer and withdrew the price and terms quoted.

There was received in evidence a series of letters and telegrams between Mrs. Wells and Roe Wells, on the one hand, and representatives of Brooks-Scanlon on the other, commencing March 3, 1939, through which, and by a personal conference in New York, negotiations for sale of the same lands were

carried on, without Hunter's participation. (Brooks-Scanlon, it may be remarked, was no new sales prospect to Mrs. Wells. The company had been approached by at least one other real estate broker besides Hunter, in her behalf, and had also negotiated with her directly.) These negotiations resulted in a contract of sale of the "south tract" to Brooks-Scanlon, executed June 20, 1939. The price was $590,000, on terms of $100,000 cash, with balance payable in ten equal semi-annual installments, without interest before maturity. The installments were evidenced by promissory notes and secured by mortgage on the property. During the period of negotiations, Roe Wells corresponded with Hunter, encouraging him to try to find buyers for the tracts remaining unsold, but did not advise him of the fact that negotiations with Brooks-Scanlon were in progress. On April 24, 1939, Hunter wrote Wells, stating that, in the event that a sale should be made, through direct negotiations, to any prospective p u r c h a s e r "which we have brought to you", (mentioning several names, including Brooks-Scanlon), he thought that he should be paid a commission. Wells immediately refused to concede this, stating that there were only a few prospective purchasers in America for that timber; that, "in the last years", several brokers had made them propositions and had brought them the names of the same prospects who had been brought forward by Hunter, including Brooks-Scanlon, and that they had in their files correspondence received directly from other prospects, including Brooks-Scanlon. "If any individual representing themselves as the principal comes to us", he said, "and we make a deal satisfactory to ourselves, we will sell to that party and not be responsible to any broker or individual for any

commission.'' So far as the evidence shows, Hunter allowed these statements to go unchallenged.

At the conclusion of the plaintiff's case, the defendant moved for a directed verdict, upon the ground, among others, that, during the time plaintiff was carrying on negotiations for the sale, he was not a licensed real estate broker. The motion was overruled, which action of the trial court the defendant assigns as error, and, because of this, and for other alleged errors, he has appealed to this court.

■■ Statutes have been enacted in most, if not all, of the states of the Union regulating the business of real estate brokers.

> '' * * * The intrinsic nature of the business combines with practice and tradition to attest the need of regulation. The real estate broker is brought by his calling into a relation of trust and confidence. Constant are the opportunities by concealment and collusion to extract illicit gains. We know from our judicial records that the opportunities have not been lost. With temptation so aggressive, the dishonest or untrustworthy may not reasonably complain if they are told to stand aside. * * *''
>
> Cardozo, J., in *Roman v. Lobe,* 243 N. Y. 51, 152 N. E. 461, 50 A. L. R. 1329.

Such regulation is a reasonable exercise of the police power of the state. *Gregory v. Roedenbeck,* 141 Tex. 543, 174 S. W. (2d) 585. Statutes of this kind are intended for the protection of the public or for the promotion of the public welfare. *Firpo v. Murphy,* 72 Cal. A. 249, 236 P. 968; *Davis v. Chipman,* 210 Cal. 609, 293 P. 40; *Haas v. Greenwald,* 196 Cal. 236, 237 P. 38, 59 A. L. R. 1493; *Frankel v. Allied Mills, Inc.,* 369 Ill. 578, 17 N. E. (2d) 570; *Verona v. Schenley Farms Co.,* 312 Pa. 57, 167 A. 317. As reasonable

regulations for the protection of the public they may be said to be similar in function to the "blue sky" laws. *American Trust Co. v. McCallister*, 136 Or. 338, 299 P. 319; *State v. Whiteaker*, 118 Or. 656, 247 P. 1077; *New Amsterdam Cas. Co. v. Hyde*, 148 Or. 229, 34 P. (2d) 930, 35 P. (2d) 980; *Johnson v. Baker*, 149 Tenn. 613, 259 S. W. 909. They are, in general, regulatory in nature, and are not revenue acts. *Kenney v. Paterson Milk & Cream Co., Inc.*, 110 N. J. Law 141, 164 A. 274, 88 A. L. R. 1416; *Donaldt v. Eberle*, 20 N. J. Misc. 349, 27 A. (2d) 612.

The real estate brokers act which was in effect during the period covered by this case is chapter 423, Laws 1929, as amended by chapter 81, Laws 1933, second special session, and chapter 91, Laws 1935. It is codified as Chapter VII of Title LXIII, Oregon Code 1930, and was repealed in 1939 and its place taken by an even more severe enactment (chapter 380, Laws 1939), which, however, substantially reenacted the provisions discussed in this opinion. Section 7 defined a real estate broker as one "who, for another and for a fee, commission or other valuable consideration, either directly or indirectly, as a whole or partial vocation, lists for sale, sells, exchanges, buys, leases or rents, appraises or places a valuation upon real estate, or offers or attempts to negotiate a sale, exchange, purchase, lease or rental of real estate, appraise or place a valuation upon real estate, or collects or offers or attempts to collect rent for the use of real estate." Section 10 provided that the doing of any one of the acts described in section 7 shall constitute the doer a real estate broker within the meaning of the act. Section 11 provided that it shall be unlawful for any person to act as a real estate broker without first obtaining a license. Section 20, as amended, provided,

among other things, that an application for a broker's license shall be accompanied by a bond in the sum of $1,000, running to the state of Oregon, to be approved by the commissioner or executed by a surety company duly authorized to transact business in this state, such bond to be conditioned that the applicant shall perform his duties and conduct his business in accordance with the requirements of the act. Section 30 read as follows:

> "No person * * * engaged in the business of, or acting in the capacity of, a real estate broker within this state shall bring or maintain any action in the courts for collection of compensation without alleging and proving that such person * * * was a duly licensed real estate broker at the time the alleged cause of action arose."

Section 31 provided that violations of the act shall be punished by a fine of not more than $500 or by imprisonment for a term not to exceed six months, or, in the discretion of the court, by both such fine and imprisonment.

The appellant contends that Hunter, by having induced Mrs. Wells, early in 1938, to list her timberlands with him for sale, and by having offered the lands for sale to Brooks-Scanlon and others, was guilty of "many criminal acts", in view of the fact that, until December 5, 1938, he was unlicensed. He asserts that no cause of action can ever arise out of the performance of a criminal act. He argues that, as a matter of fact, Hunter had fully performed his contract on December 2, 1938, when he procured Brooks-Scanlon as a purchaser ready, willing and able to buy the property, and transmitted its offer to the owner. If he was entitled to any commission, appellant suggests that he had earned it on that date, and that anything

he did subsequent thereto was supererogatory, and added nothing to his claim.

The respondent counters the foregoing proposition by maintaining that the act does not prevent recovery of his commission, although he was unlicensed at the time when he obtained his contract and even while he performed services thereunder, provided always that he was licensed at the time when his cause of action arose.

While it was a criminal offense for any person to do business as a real estate broker without having first obtained a license, the act, beyond providing suitable penalties for such offense, does not specifically declare that brokerage contracts entered into by unlicensed brokers are void or unenforceable. The full text of section 11 was as follows:

> "It shall be unlawful for any person, firm, partnership, copartnership, association or corporation to act as a real estate broker or real estate salesman, or to advertise or assume to act as such real estate broker or real estate salesman, without first obtaining a license therefor, except as otherwise exempted herein."

The only civil consequences for violation of the provisions of the foregoing section are those contained in section 30, as follows:

> "No person, firm, partnership, copartnership, corporation or association engaged in the business of, or acting in the capacity of, a real estate broker within this state shall bring or maintain any action in the courts for the collection of compensation without alleging and proving that such person, firm, partnership, copartnership, association or corporation was a duly licensed real estate broker at the time the alleged cause of action arose."

Appellant insists that, when a statute is intended for the protection of the public, any contract made in violation of its provisions is void, citing *Levinson v. Boas,* 150 Cal. 185, 88 P. 825, 12 L. R. A. (N. S.) 575, 11 Ann. Cas. 661; *Glascock v. Mansfield,* 25 Tenn. A. 401, 158 S. W. (2d) 358; *Schramm v. Bank of California,* 143 Or. 546, 20 P. (2d) 1093. Regulatory statutes of the sort under consideration here are of two classes. One class, while prohibiting the performance of certain acts and prescribing a criminal penalty, expressly provides that all acts done in violation of the statute shall be invalid. The other forbids the performance of certain acts and prescribes a criminal penalty, but makes no express provision that acts which are performed in violation of the statute shall be invalid civilly.

*Frankel v. Allied Mills, Inc.,* supra, (369 Ill. 578, 17 N. E. (2d) 570), flatly states the rule to be that, where a statute declares certain acts to be unlawful and imposes a penalty therefor, a contract based upon the performance of such acts is void. In *Bendell v. De Dominicis,* 251 N. Y. 305, 167 N. E. 452, the New York statute construed by the court required that a real estate broker, when suing to recover a commission, should allege and prove that he was licensed "on the date when the alleged cause of action arose." The plaintiff in that case was licensed at the time when he was employed to sell certain real property, but on the date when he procured a prospective purchaser his license had expired. Later, he obtained a new license, and was operating under that license when the contract of sale was entered into. It was held that his claim for compensation was barred because of the criminal nature of those services, which he performed

during the period while he was unlicensed. *Whiddett v. Mack,* 50 Nev. 289, 258 P. 233, arose under a statute similar to ours. The court there held that the object of such statutes was the protection of the public, and that they are to be construed as prohibiting contracts entered into without compliance by the broker with the prescribed conditions. The complaint in that case failed to allege that the plaintiff was a licensed broker at any time, and, for that reason, the court held that a demurrer by the defendant should have been sustained. The court stated, however, that the effect of the entire act was plainly to prevent unlicensed persons from engaging in the business of real estate broker. In *Irons Inv. Co. v. Richardson,* 184 Wash. 118, 50 P. (2d) 42, the plaintiff had performed services while it was unlicensed, but was licensed at the time its commission became due and payable. The court held that, in order for a real estate broker to recover a commission, he must have had a license at the time when he rendered the service for which he seeks compensation. The statute involved in that case was similar to ours, but the factual situation appeared to be that the broker had completely performed his services and the sale was consummated before he obtained a license. It stated, however, that the provision of the act under which the plaintiff was required to allege and prove that it was a duly licensed real estate broker at the time when its cause of action arose did not constitute a limitation upon those provisions which penalized persons from engaging in business as real estate brokers without having secured a license, but rather imposed an additional burden upon those who might otherwise have complied with the requirements of the act considered in its entirety. In order to recover a real estate broker's commission, said the court, a party must have

a broker's license at the time when he renders the service for which he seeks compensation. *Grammer v. Skagit Valley Lbr. Co.,* 162 Wash. 677, 299 P. 376, was a case in which the plaintiff was unlicensed at the time when he negotiated a sale. The court held that he could not recover a commission, notwithstanding the fact that he claimed not to be a broker. The plaintiff in that case, however, was not licensed at any time covered by his services.

The California act construed by the case of *Houston v. Williams,* 53 Cal. A. 267, 200 P. 55, contained a provision similar to that contained in our act, to the effect that no person engaged in the business of a real estate broker might bring or maintain any action to recover a commission or compensation for the sale of real property "without alleging and proving that such person * * * was a duly licensed real estate broker * * * at the time the alleged cause of action arose". The plaintiff was not licensed at the time when he obtained his brokerage contract, but was licensed when he procured a prospective purchaser. The court held that, under the statute, he was entitled to recover, saying:

" * * * It would seem to follow that a contract having in view the performance of any of the acts recited in said statute, if said contract was executed by one to whom no license has been issued, would be invalid, unless there is something in the act itself which operates to limit or modify said rule. We think such limitation is found in section 20 of the act, providing that—(Here the court quotes the statutory provision above referred to.)

"Manifestly the Legislature herein undertook to prescribe an essential condition of recovery, but limited its operation to the time when the cause of action arose. By implication any earlier period was

excluded. It is a reasonable construction of the act to hold that it is unlawful for any one to engage in the business of a real estate broker without having secured a license, but he is not precluded from recovering compensation for his services if he had such license at the time his cause of action arose, although his contract may have been executed prior to that time when he had no license. Herein, manifestly, the cause of action arose when plaintiff obtained a purchaser for the property, and it is not disputed that then he had the proper license, and it was so alleged in the complaint.''

In *Davis v. Chipman,* 210 Cal. 609, 293 P. 40, a decision by the supreme court of California, the plaintiff was not licensed at the time when his services were performed and the sale consummated, but was licensed before his commission was due and payable. The court commented that, under plaintiff's version of the statute, an unlicensed broker might negotiate and actually effect a sale of property and do anything that a licensed broker might do, and, if his contract provided for payment of his commission at a future date, collect his commission, provided he secured a license on or before that date. It held that the legislature never intended that the act should receive such a construction, as it would present the anomaly that a person might be prosecuted on the criminal side of the court for violating the statute and, at the same time, on the civil side, recover a judgment based upon his illegal acts. It appears that the plaintiff-broker in that case had no license at any time while he was performing his services, or even when the sale was consummated. While the court denied him recovery of his commission, it approved the doctrine of *Houston v. Williams,* supra (53

Cal. A. 267, 200 P. 55), but expressly restricted its effect. We quote:

"In *Houston v. Williams,* supra, it was held that a limitation upon this rule was made by section 20 of the act, and that the rule in all its rigor should not apply to a person holding a broker's license at the time he consummated a sale of real property, even though he had no such license at the time he entered into a contract with the owner to pay him a commission. The court there held that a reasonable construction of the act would permit such a holding. While agreeing with the appellate court in this ruling, we are further of the opinion that it would be a most unreasonable construction of the statute to hold that it permitted an action to be maintained as in the present proceeding where the plaintiff had no license at the date the sale of the property was effected, *or during any of the time during which he rendered the services for which he seeks to recover,* and only secured such a license practically a year after the sale was effected. As plaintiff held no broker's license at the time the sale involved herein was consummated, he is not entitled to recover compensation for his services, all of which were rendered prior to his securing any license. (Italics ours.)

\* \* \*

"We find no decisions of our courts that have extended the rule beyond that enunciated in that case. To adopt plaintiff's construction of the statute would be to defeat the whole object and purpose of the Real Estate Brokers Act. \* \* \* Under plaintiff's version of this statute a person without a license to act as a real estate broker might enter into contracts for the payment of a commission for the sale of real property, might interest prospective purchasers in the purchase of said property, might actually effect a sale of said property for the owner, in fact, he might do anything that a licensed broker might do, and then by having his contract provide

for the payment of his commission at a future date, collect his commission, provided he secured a license on or before the date his commissions became due. We are satisfied that the Legislature never intended the act should receive any such construction.''

In *Haas v. Greenwald,* supra (196 Cal. 236, 237 P. 38), it appeared that plaintiff and two others were employed to sell real property. One of them was unlicensed. The court held that the agreement contemplated performance of joint and several services, as real estate brokers, of the three persons involved, and one of them having been unlicensed at all times, the entire agreement was void.

*Burns v. Gartzman,* 139 Pa. Super. 453, 11 A. (2d) 708, construed the Pennsylvania brokers act of 1929. (63 P. S. § 431 et seq.) The provisions of that act are perhaps even more stringent than those of our statute. They make it unlawful for any person to act as a real estate broker without having obtained a license, and provide that no action shall be instituted by any person for compensation for any act done or services rendered as a real estate broker, unless he was duly licensed at the time of the doing of such act or the rendering of such services. The plaintiff was not licensed until the very day he obtained and submitted to the seller the buyer's offer to purchase. The seller refused to consummate the sale. The court held that the plaintiff's claim rested upon an illegal foundation and could not be sustained.

The Arkansas statute made it unlawful for an unlicensed person to carry on business as a real estate broker, and provided that no commission might be recovered by a broker unless he was licensed under the provisions of the act, and such fact was stated in his complaint. In *Birnbach v. Kirspel,* 188 Ark. 792,

67 S. W. (2d) 730, the plaintiff-broker, although he had been licensed immediately before and was again licensed eight days thereafter, was unlicensed on the day of the sale. The court held he could not recover a commission.

*Brandenburg v. Miley Petroleum Exploration Co.,* 16 F. (2d) 933, construed the California securities act. This was an action by unlicensed brokers of securities to recover compensation for services performed as brokers. The complaint failed to show that plaintiffs were licensed at the time when they performed the services, as required by the law of California. An amendment pleaded that they procured a license subsequent to the time when their contract to sell the securities was made and their services thereunder performed. A demurrer to the complaint was sustained. See also *Fewel & Dawes v. Pratt,* 17 Cal. (2d) 85, 109 P. (2d) 650.

The respondent places great reliance upon *Uhlmann v. Kin Daw,* 97 Or. 681, 193 P. 435. In that case the plaintiffs, a copartnership, had for a considerable time done business in the state of Oregon under an assumed business name, without having filed the certificate required by the act regulating the transaction of such business. (Chapter 5, Title XLIII, O. C. L. A.) The act makes violation of its provisions a misdemeanor, punishable by a fine not exceeding $100. It provides that no person or persons carrying on business under an assumed name shall be entitled to maintain any suit or action in any of the courts of this state, without alleging and proving that such person or persons have filed a certificate, in specified form, respecting such name and such business. Failure to file such certificate is made prima facie evidence of fraud in securing credit. The partnership-plaintiffs had advanced

moneys to the defendant, secured by a mortgage upon certain lands and crops. In a suit to foreclose the mortgage, the defendant filed a plea in abatement, to the effect that the plaintiffs were not entitled to maintain the suit, for the reason that they had failed to file the certificate above referred to. The opinion in the case was written by Mr. Justice HARRIS. It recognized the general rule that an agreement is illegal if it is contrary to law, morality or public policy, and said that, stating the rule broadly, an agreement is illegal if it violates a statute or cannot be performed without violating a statute. It stated, however, that such a rule is not inexorable and unbending. "The inquiry is as to the legislative intent, and that may be ascertained, not only by an examination of the express terms of the statute, but it may also be implied from the several provisions of the enactment." If, taking the statute by its four corners and carefully considering its terms, its object, the evil it was enacted to remedy, and the effect of holding agreements in violation of it void, it is manifest that the lawmakers did not intend that an agreement made in contravention of the statute should be void, then such agreements should be held to be legal contracts and enforceable as such. Oregon is committed, said the court, through prior precedents by state and federal courts following the doctrine of *Harris v. Runnels,* 12 How. 79, 84, 13 L. Ed. 901, to give sanction to the foregoing rules. A statute may have as its primary purpose the prohibition of certain acts in a given field; or, on the other hand, may have for its primary purpose the imposition of duties which are merely collateral to a given act or agreement arising out of the statute. The statute being penal in character, the court applied a strict rule of construction in fixing the limits and penalties of

the field in which it should operate. It recognized that the right of persons to do business as partners is a common-law right, and that the statute is in derogation of the common law. It held that it was not the primary purpose of the statute to prevent the transaction of business, but rather to require the performance of a statutory duty entirely collateral to any agreement that might arise out of any business transaction. The consequences which the statute attached to a failure to file a certificate are inconsistent with any legislative intent to avoid agreements. Those consequences were (1) punishment by fine; (2) a rule of evidence, making failure to file the certificate prima facie evidence of fraud in securing credit; and (3) inability to maintain a suit or action. Continuing, the court said:

> "The act does not in terms say that any agreement made by an offending person or persons is void; and there is a strong implication to the contrary, for, when declaring that suit or action cannot be maintained, the statute in effect suspends the right to enter the courts until such time as the offending person or persons comply with the statute by filing the certificate. If an agreement is void when made by one failing to file a certificate, why declare in a statute that a suit cannot be maintained? The fact that the legislature has expressly said that a suit or action cannot be maintained is a strong circumstance pointing to the fact that the legislative mind assumed that an agreement would be valid, and, in the absence of some express legislative declaration to the contrary, would be enforceable. * * *"

The court held further that failure to file the certificate affected only the qualification of the person to sue, and that, upon filing a certificate, the disqualification was removed, and a suit or action might be maintained on a contract made before or after such filing.

It would appear that the general rule sustains the validity of contracts entered into without compliance with statutes governing the doing of business under an assumed name. 38 Am. Jur., Name, section 13.

■ While the real estate brokers act and the assumed business name act both contain prohibitions and civil and criminal penalties, nevertheless we are of the opinion that a consideration of the terms of the former justifies a construction that it was intended by the legislature that agreements entered into in violation of its terms should be void. The two statutes may be broadly distinguished. Under the assumed business name act, any person or persons may qualify to do business under an assumed name by the mere voluntary filing of a certificate. They need no license; need comply with no test; need give no bond or undertaking for the protection of persons with whom they deal. The mere filing of the certificate qualifies a rascal to do business under an assumed name, equally with an honest man. His subsequent rascality cannot be penalized by taking away his right to do business under his fictitious name. While violation of any of the provisions of the act is classed as a misdemeanor, there is no indication that each separate act of business shall be regarded as a distinct violation. Moreover, the criminal penalty attached is a mere fine of not exceeding $100. Generally, in such cases, the infliction of the statutory penalty is deemed sufficient to accomplish the legislative purpose. 38 Am. Jur., Name, section 15.

The real estate brokers act herein construed, on the other hand, makes it unlawful for any person to act as a real estate broker without first obtaining a license. It prohibits a broker from dividing his commission with any other person not a licensed broker. It provides

that "licenses shall be granted only to persons who are trustworthy and competent to transact the business of a real estate broker or real estate salesman in such manner as to safeguard the interests of the public and only after satisfactory proof has been presented to the commissioner." Only persons who bear a good reputation for honesty, truthfulness and fair dealing may be licensed, and no license shall be granted to any person who has been convicted of a felony within a period of three years after such conviction. Strict supervision of licensees is effected, by a provision that all licenses shall expire on December 31st of the year in which they are issued. It is required that each broker shall display his license in a conspicuous position in his place of business. He is not permitted to operate as a broker unless he has in his possession a pocket card, issued by the real estate commissioner, and he must display such card to any person upon request. His application for a license must be accompanied by the recommendations of at least ten citizens who have known him for a period of six months, who are not related to him, and who are owners of real estate in the county in which he intends to carry on his business, which recommendations shall certify that such persons are acquainted with the applicant, and that he bears a good reputation for honesty, truthfulness, fair dealing and competency, and shall recommend that a license be granted to him. He is required to furnish a sworn statement, setting forth his present address, both business and residence, a complete list of all former places where he may have resided or have been engaged in business for a period of sixty days or more during the past five years, accounting for such entire period, with the length of such residence, and the name and address of at least one real estate broker in each of the counties where

he may have resided or engaged in business. He must pay an annual license fee. His application for a license must be accompanied by a bond in the sum of $1,000. Any person injured by the failure of the broker to perform his duties or comply with the provisions of the act is given the right, in his own name, to bring action against the broker and his sureties for the recovery of any damages sustained by such person through such failure. The commissioner is authorized, either of his own motion or on the complaint of any other person, to investigate the actions of any real estate broker, and is given power to suspend, cancel or revoke his license if he is deemed guilty of any course of conduct specifically proscribed by the act, or, generally, of any other conduct which constitutes fraud or dishonest dealing. Provision is made for formal hearings by the commissioner, and for appeal from his decisions to the circuit court of the county. The doing of any single act of the business of a real estate broker, as defined in the statute, is made a violation thereof. The criminal penalties are severe, being, as stated, a fine of not more than $500 or imprisonment for not to exceed six months, or both such fine and imprisonment.

Our neighboring states of California and Washington have assumed business name statutes, and, in each of those jurisdictions, such statutes have been construed, as by this court in *Uhlmann v. Kin Daw,* supra (97 Or. 681, 193 P. 435), as not voiding or rendering unenforceable contracts entered into by a person doing business under an assumed name without having filed the necessary certificate. Such violation of the law was held to be mere matter of abatement, going only to the legal capacity of the plaintiff to sue. *Bryant v. Wellbanks,* 88 Cal. A. 144, 263 P. 332; *Union*

*Trust Co. v. Quigley,* 145 Wash. 176, 259 P. 28. Notwithstanding such interpretation of their assumed business name acts, however, Washington has construed its real estate brokers act as rendering unenforceable agreements entered into by unlicensed brokers (*Irons Inv. Co. v. Richardson,* supra [184 Wash. 118, 50 P. (2d) 42]), and California has indicated that its legislature never intended that its real estate brokers act should receive any such construction as would permit an action to be maintained by a broker to recover a commission, when he had no license at the time the sale was effected, or during the time in which he rendered the services for which he seeks to recover. *Davis v. Chipman,* supra (210 Cal. 609, 293 P. 40).

Adverting to *Harris v. Runnels,* supra (12 How. 79, 13 L. Ed. 901), to the doctrine of which Oregon is committed, (*Uhlmann v. Kin Daw,* supra), the circumstances which gave rise to that case were as follows: A statute of Missouri prohibited the importation of slaves into that state except upon due execution and registration of a certificate by two respectable freeholders in the county and state from which the slaves were brought, describing the slaves, and certifying that they had not been guilty or convicted of murder, burglary, arson or felony, within the knowledge or belief of such freeholders. For violation of the act, both seller and purchaser might be fined $100 for every slave sold or purchased. The action was brought to enforce collection of a note which defendant had given plaintiff for the purchase price of slaves which plaintiff had imported in violation of the act. The defendant specially pleaded illegality of consideration. We quote from the court's opinion:

"" * * * The law making contracts, in contravention of statutes, irrecoverable by suit, will be

first stated and afterwards applied to this case.

"There is no doubt that *assumpsit* cannot be sustained upon a contract which has not a sufficient consideration. It must not be illegal, of an immoral tendency, or contrary to sound policy. The common law maxims are *ex turpi causa, non oritur actio— ex dolo malo non oritur actio*. It prohibits everything which is unjust or *contra bonos mores*. The object of all law is to repress vice and to promote the general welfare of society; and it does not give its assistance to a person to enforce a demand, originating in his breach or violation of its principles and enactments. Contracts in violation of statutes are void; and they are so whether the consideration to be performed or the act to be done be a violation of the statute."

The court observed that it makes no difference whether the statutory prohibition be expressed or implied. In either case, a contract in violation of its provisions is void. The rule which avoids a contract made in contravention of a statute, however, is not absolute. For example, it does not apply to statutes made for the protection of the revenue only, or to the non-observance of excise regulations, although a penalty attaches, if not accompanied by fraud. It will always be applied, when the statute is for the protection of the public from moral evils, or from those which, from experience, we know society must be guarded against by preventive legislation. Before it can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty, or a penalty only for doing a thing which it forbids, the statute must be examined as a whole, to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not to be so. Whatever may be the structure of the statute in respect of prohibition and penalty, or penalty alone, it is not

to be taken for granted that the legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice. In this way, the principle of the rule is admitted, without at all lessening its force, although its absolute and unconditional application to every case may be denied. Applying those rules, the court commented that the statute penalized both seller and buyer of slaves imported in violation of its provisions; that, taken conjunctively, the prohibition and the penalty seemed to imply that in that case the penalty only, without any other loss to either seller or buyer, was to be inflicted; and that, viewing the subject-matter and the sufficiency of the penalty relatively to the value of a slave, and the mischief against which the legislature meant to guard, it might be implied that the legislature did not mean that such a contract might not be enforced in a court of justice. No forfeiture of the slave, or provision for his removal from the state, was provided for. The state's policy was to exclude all negroes tainted with crime. For aught that appeared, the buyer bargained for the slaves, knowing that they had been brought into the state unlawfully. If there was a violation of the law by their purchase, the buyer stood *in pari delicto* with the seller, and sought to add to his breach of the law the injustice of retaining the negroes without paying for them. The law will not aid either of two parties standing *in pari delicto* in violation of a statute. While a defendant, against whom a contract for an illegal purpose is sought to be enforced, may, to prevent it, show both the turpitude of himself and of the plaintiff, nevertheless, as Lord Mansfield said: ''The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the

defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff.''

So far, in the main, we have paraphrased the opinion. Once more, we quote directly:

"Make, then, this contract void, by the application of the rule *pari delicto potior conditio est defendentis et possidentis,* and the defendant, in the event of his conviction for transgressing the statute, would be substantially released from the penalty as to all the objects for which punishment is ever inflicted; because, having the power to retain the negroes, he would pay the fine from their labor, or would get them for only so much less than he bargained to give for them. In other words, the seller, if convicted too, would pay his own and the buyer's fine. Again, as the rule is not allowed for the benefit of either party to an illegal contract, but altogether upon grounds of public policy, we do not think that public policy calls for the application of it in this case, as the defendant might keep the slaves which he bought from the plaintiff within the State of Mississippi, contrary to the law which forbade the sale of them.

"Such decided advantages, to one of two who have violated a statute by a contract, could not have been meant by the Legislature of Mississippi.''

*Held*, that the contract was not void, and that the defendant could take nothing by his plea.

Applying the touchstone of the above case (*Harris v. Runnels,* supra) to the statute under consideration, and viewing the statute as a whole, we construe it as being intended to protect the public from evils which, as experience has taught us, flow from the practice of the real estate broker's business by unlicensed, unregu-

lated persons. Only the unlicensed broker is penalized —not the property-owner—and the latter is in no respect *in pari delicto* with the former. The penalties, (fine or imprisonment, or both, with loss of compensation) are severe, but not disproportionate to the evils sought to be prevented. From the general tenor and stringent terms of the statute, the patent necessity for public regulation of the broker's business, the fiduciary relationship between owner and broker, and the opportunities to profit by sharp practices which the latter is afforded by such relationship, (cf. Cardozo, J., in *Roman v. Lobe,* supra), we are of the opinion that the statute was designed as a legislative measure for public protection, and that it was the legislative intention to render void all contracts entered into in contravention of its terms. This interpretation, we are persuaded, is in harmony with the principles of statutory construction laid down in *Harris v. Runnels,* supra, and is in accord with what we consider to be the better-reasoned authorities. Anno., 30 A. L. R., at p. 852; 42 A. L. R., at p. 1228; 118 A. L. R., at p. 654.

■■ Moreover, considering the statute in its entirety, and its obvious purpose to prevent unlicensed persons from doing business as real estate brokers, we inquire what the legislature meant by the use of the expression, ''at the time the alleged cause of action arose.'' Viewed superficially, it might seem that it was intended that the word ''arose'' should be synonymous with the word ''accrued''. Such interpretation, however, would have the effect of removing from the act that sanction which, beyond all others, might have a tendency to insure the performance of its major object. It is not to be presumed that the legislature so intended. Thus, in *Brown Cracker & Candy Co. v. Jen-*

*sen,* (Tex.) 32 S. W. (2d) 227, it was held, construing a venue statute which permitted certain suits to be brought in any county in which the cause of action, or a part thereof, arose, that, while the cause of action therein involved did not accrue in favor of plaintiff until there was a union of the right of the plaintiff and its infringement by the defendant, "arose" referred to every fact which had arisen and inhered in the cause of action. *Moran v. Moran,* 144 Iowa 451, 123 N. W. 202, 30 L. R. A. (N. S.) 898, in which the action was upon a promissory note, the point involved was whether or not the action was barred by the Michigan statute of limitation (six years), or was governed by that of Iowa (ten years). The Iowa statute made provision for giving effect to foreign statutes of limitation, but excepted from the operation thereof "causes of action arising within this state". The opinion reads, in part, as follows:

" * * * While technically speaking there is perhaps no such thing as a 'cause of action' on a promissory note until it is due and the holder is entitled to sue thereon, there is a sense in which such cause exists from the moment when the promise becomes a legal and binding obligation. True, it is an imperfect or inchoate right, but it is none the less real. The right to institute action 'accrues' when by maturity of the note and default in payment the holder may maintain a suit thereon, but it 'arises' or has its origin in the transaction which brought the obligation into existence. The two phrases—'cause of action accrues' and 'cause of action arises'—are both used in our statute, and in a manner which clearly indicates an attempt to express different ideas, and the distinction we have above indicated effectuates what we think was the apparent legislative purpose. We are not without precedents in point. In Emerson v. Steamboat, 10 Wis. 433, it is said: 'A cause of action may be said

to arise when the contract out of which it grows is entered into or made.' Also in Steele v. Commissioners, 70 N. C. 139, a statutory phrase, 'where the cause of action arose,' was held to mean where the debt was contracted, and not the place of failure to pay the debt. In Lloyd v. Perry, 32 Iowa, 144, the defendant executed a note in Ohio to a citizen of that state, but moved to Iowa before the debt was due. He remained here two years, during which time the note matured, then removed to Kansas, living there long enough for the statute of that state to bar an action in its courts upon this obligation. Returning then to this state, suit was brought on the note, and he set up in defense the bar of the Kansas statute. The plaintiff attempted to avoid the effect of this plea by arguing that the cause of action 'arose' in this state during the defendant's former residence here; hence he could not avail himself of the defense of the statute. It will be seen at once that this objection was perfectly sound if appellant's theory of the construction of the statute is correct. But the court refused to so rule, holding that 'the cause of action did not arise in this state.' The last clause of Code, § 3452, 'but this section shall not apply to causes of action arising within this state,' had its origin in chapter 167, p. 206, Acts 13th Gen. Assem. The court had occasion to cite that provision in Thompson v. Read, 41 Iowa, 48, and in construing its terms Mr. Justice Beck, writing the opinion, says: 'It is presumed that the language was intended to apply to actions arising upon contracts executed in this state, and it is so concluded.' The same effect is given the statute in Goodnow v. Stryker, 62 Iowa, 224, 14 N. W. 345, 17 N. W. 506, and Bradley v. Cole, 67 Iowa, 652, 25 N. W. 849. It follows from these conclusions that the trial court did not err in overruling the appellant's plea of the statute of limitations."

In *Planters' Cotton Oil Co. v. Whitesboro Cotton Oil Co.,* (Tex.) 146 S. W. 225, the law construed provided

that suit against a private corporation might be commenced in any county in which the cause of action arose. The court conceded that, broadly speaking, "cause of action" comprehends the agreement between the parties, its performance by one and its breach by the other. In *Gregg v. Middle States Utilities Co. of Delaware,* 228 Iowa, 933, 293 N. W. 66, 132 A. L. R. 415, it was held that a stockholder's cause of action to repurchase stock on demand might be said to have arisen when the agreement for purchase was originally made, but did not accrue, with respect to the running of the statute of limitation, until the stockholder demanded that the corporation repurchase, and such demand was refused. The opinion cites *Moran v Moran,* supra (144 Iowa 451, 123 N. W. 202). In *Burns, Sheriff, et al. v. Duncan,* 23 Tenn. A. 374, 133 S. W. (2d) 1000, the court held that "the cause of action includes all the facts which together constitute the plaintiff's right to maintain the action."

"As referring to pleading and proof, a cause of action has been particularly defined as the facts upon which plaintiff's right to sue is based, and upon which defendant's duty has arisen, coupled with the facts which constitute the latter's wrong; the statement of facts upon the happening or non-happening of which plaintiff bases his action; the facts necessary to be alleged and proved in order to obtain the relief sought, and on account of which the action is instituted; every fact which it is necessary for plaintiff to prove, if traversed, in order to sustain his action and obtain a judgment; or, conversely, every fact which defendant would have a right to traverse."

1 C. J. S., Actions, section 8 (c).

This court, in *Elliott v. Mosgrove,* 162 Or. 507, 540, 91 P. (2d) 852, 93 P. (2d) 1070, has approved a defini-

tion of the term "cause of action" given in Phillips on Code Pleading, section 30, as follows:

> "The question to be determined at the threshold of every action is, whether there is occasion for the state to interfere. Therefore, when a suitor asks that the public force be exerted in his behalf, he must show that there is, prima facie, occasion for the state to act in his behalf. That is, he must show a right in himself, recognized by law, and a wrongful invasion thereof, actual or threatened. And since both rights and delicts arise from operative facts, he must affirm of himself such investitive fact or group of facts as will show a consequent legal right in him, and he must affirm of the adversary party such culpatory fact or facts as will show his delict with reference to the right so asserted. The formal statement of operative facts showing such right and such delict shows a *cause for* action on the part of the state and in behalf of the complainant, and is called, in legal phraseology, a *cause of action*."

■ We hold, in view of the legislative purpose as it is to be gathered from a consideration of the statute as a whole, that the expression, "at the time the alleged cause of action arose", is to be interpreted as meaning at the time, or throughout the period, when the broker performed the services which culminated in the accrual of his cause of action.

■ We are of the opinion further that the provision of the statute, requiring a broker to allege and prove that he was duly licensed when his cause of action arose, is not a limitation upon those provisions which prohibit a broker from doing business without a license, "but rather imposes an added burden upon those who may have otherwise complied with the requirements of the act considered in its entirety." *Irons Inv. Co. v. Richardson,* supra (184 Wash. 118,

50 P. (2d) 42). If the act were construed otherwise, it would fail to render adequate protection to the public against the machinations of unscrupulous persons assuming, without a license, to act as brokers in defiance of law. This construction of the law prevents the absurdity of permitting such persons to recover compensation for criminal acts, while at the same time it affords the public the protection which it was the evident intention of the legislature to provide. Incidentally, it gives protection to ethical members of the broker's profession, who, having themselves complied with the law in letter and in spirit, would, under a loose interpretation, be subjected to competition by persons who had violated the law both in letter and in spirit.

Respondent contends that, while some of his services were performed prior to December 5, 1938, the date upon which he became licensed, nevertheless the terms of his employment agreement were completely reiterated and renewed by Mrs. Wells and by Roe Wells subsequent to that date, and he obtained his first formal commitment in writing, containing the first definite price and terms for a proposed contract of sale, on December 9, 1938, after he was licensed. This contention cannot be sustained.

■ Under Hunter's contract of employment, he was not authorized or required to negotiate or consummate a sale. He was authorized only "to procure a purchaser" with whom the owner should consummate a sale. The tentative offer, or rather inquiry, of December 9, 1938, did not differ substantially from the tentative inquiry of December 2, 1938. There was a slight increase in the price ($1,500 over the first figure of $633,500), but that was considerably more than offset

by the stipulations that the buyer would pay no interest on deferred installments and that the seller should pay the taxes. We think that if, under the circumstances, he performed his contract by procuring a purchaser ready, willing and able to purchase at a price and on terms satisfactory to the owner, as required by his contract, (as to which we express no opinion), he did so on December 2, 1938. On that date, if he had been duly licensed during the period covered by his services, he had earned his commission. *Slotboom v. Simpson Lumber Co.*, 67 Or. 516, 526, 135 P. 889, 136 P. 641, Ann. Cas. 1915C, 339. The slight variation suggested later in the price and terms neither halted the negotiations nor brought a new or different purchaser into the transaction. The negotiations, in any event, were, under the contract, the owner's affair, not the broker's. As he was not licensed during the period in question, he cannot recover.

In our opinion, the defendant's motion for a directed verdict should have been sustained.

The judgment is reversed, with costs, and the cause is remanded with directions to enter judgment for defendant.

Petition for rehearing denied April 3, 1945

## ON PETITION FOR REHEARING
### (157 P. (2d) 510)

HAY, J.

Respondent, in support of a petition for rehearing, has submitted a spirited brief in which he contends that our construction of the real estate brokers act (Ch. 423, Laws 1929; Ch. VII, Title LXIII, Oregon Code 1930) fails to give any effect to section 30, which provides that no person shall maintain an action for

collection of compensation as a real estate broker without alleging and proving that he was duly licensed at the time the alleged cause of action arose. At our request, appellant filed an answering brief.

■ In the construction of a statute, where there are several provisions or particulars, the court must, if possible, give effect to all of them. Section 2-216, O. C. L. A.; *Astoria v. Kozer*, 124 Or. 261, 264 P. 445; *Union Pacific Railroad Co. v. Bean*, 167 Or. 535, 119 P. (2d) 575.

Respondent criticizes statements in our opinion, to the effect that it was the legislative intention that agreements entered into in violation of the provisions of the statute should be void. He argues that such might have been a proper construction had section 30 been omitted, but that its inclusion should impute a legislative intention to the contrary in the case of a broker who secured his license before his cause of action accrued.

■ This argument, we think, ignores the primary purpose of the legislature in the enactment of the statute. Our opinion holds that such primary purpose was the protection of the public from evils which flow from the practice of the real estate broker's business by unlicensed persons. The doing, by an unlicensed person, of any of the acts which the statute embraces within its definition of the functions of a real estate broker is made a criminal offense, and the general tenor of the statute, interpreted in the light of its purpose, prohibits an unlicensed person both from entering into an agreement to act as a real estate broker and from performing such an agreement. See, in addition to the authorities cited in our original opinion, Restatement, Contracts, section 580. To construe section 30

as respondent would have us do, would indeed benefit brokers who have operated in contravention of the statute, but would render the prohibitory provisions thereof largely ineffectual. We cannot concede that our construction of section 30 fails to give it effect and significance. On the contrary, in our opinion, it gives such section full and logical effect in the light of the statute as a whole and of the purpose of the legislature.

Respondent seeks, by analysis, to construe as *dicta* the holdings in *Frankel v. Allied Mills, Inc.,* 369 Ill. 578, 17 N. E. (2d) 570, and *Bendell v. De Dominicis,* 251 N. Y. 305, 167 N. E. 452, cited in our original opinion. He cites (and cited in his original brief) the case of *Calhoun v. Banner,* 254 N. Y. 325, 172 N. E. 523, as having permitted recovery by a broker who was not licensed at the time when he was employed but was licensed before his customer accepted the seller's offer to sell. The New York statute is somewhat dissimilar to ours, in that it requires the broker to allege and prove that he was duly licensed *"on the date* when the alleged cause of action arose". (Italics ours.) In any event, Calhoun v. Banner is of no help to respondent here, the factual situation having been different, as the following quotation from the opinion therein indicates:

> " * * * Until the license was obtained any services he might render would be illegal; but for such illegal services, if any, the plaintiff claims no compensation. *All the negotiations, all the services rendered through which the plaintiff induced his customer to accept the defendants' offer, came after the date of the license.* No illegal act by the plaintiff was a producing cause of the results achieved by the plaintiff for which he claims compensation, or taints with his own illegality the plaintiff's cause of action." (Italics ours.)

■ Respondent insists that, under the authority of *Uhlmann v. Kin Daw*, 97, Or. 681, 193 P. 435, this court must necessarily hold that, by section 30 of the statute, the legislature strongly implied that an unlicensed broker's agreement would be valid provided he secured his license before the sale was actually consummated. Such a conclusion does not follow from the Uhlmann decision. There, the court relied upon the decision in *Harris v. Runnels,* 12 How. 79, 13 L. Ed. 901, which our original opinion herein analyzed. We derived therefrom the fundamental distinction between the Uhlmann case and the case at bar, viz., that the rule, which avoids a contract made in contravention of a statute, will *always* be applied when the statute is intended for the protection of the public against those evils which we know from experience society must be guarded against by protective legislation. The statute under consideration is such a one.

Respondent admits that, by way of dictum, *Irons Inv. Co. v. Richardson,* 184 Wash. 118, 50 P. (2d) 42, supports the conclusion reached by this court. The opinion in that case held that the broker must allege and prove that he had a license at the time when he rendered the service for which he seeks compensation. It is true, as stated in our original opinion, that in that case the broker had completely performed his services and the sale was consummated before he obtained a license. To that extent, the statement of the court, above referred to, was dictum, but nevertheless, in our opinion, it embodied a correct interpretation of the statute.

Respondent places considerable reliance upon the case of *Pierce v. Isabel,* 70 Ohio App. 385, 40 N. E. (2d) 481, 46 N. E. (2d) 292. That case was decided under a

much milder statute than ours (section 6377-25, et seq., Ohio General Code). It defined a real estate broker as follows:

> " 'Real estate broker' means a person, firm or corporation who, for a commission, compensation or valuable consideration, sells, or offers for sale, buys, or offers to buy, negotiates the purchase or sale or exchange of real estate, or leases, or offers to lease, rents, or offers for rent, any real estate, or improvement thereon, for others.''

It will be observed that the listing of real estate for sale is not included within the definition, whereas in our statutory definition it is included. *Pierce v. Isabel,* supra, therefore, does not appear to be in point.

Our original opinion conceded that *Houston v. Williams,* 53 Cal. A. 267, 200 P. 55, was authority for the respondent's position, although we insisted, and still insist, that that authority was greatly weakened by *Davis v. Chipman,* 210 Cal. 609, 293 P. 40. The later California cases of *Brenneman v. Lane,* 87 Cal. App. 414, 262 P. 400, and *Corvin v. Smead,* 115 Cal. App. 175, 1 P. (2d) 507, are in accord with *Houston v. Williams,* and incidentally, we think, not in accord with the *dicta* of the California supreme court in *Davis v. Chipman.* Upon further consideration of the California statute, however, we have concluded that *Houston v. Williams, Brenneman v. Lane,* and *Corvin v. Smead,* supra, are not in conflict with our opinion herein. The California statute (chapter 605, Cal. St. 1919) thus defines a real estate broker:

> "A real estate broker within the meaning of this act is a person, copartnership or corporation who, for a compensation, sells, or offers for sale, buys, or offers to buy, or negotiates the purchase or sale or exchange of real estate, or who, for compensation,

negotiates loans on real estate, leases, or offers to lease, rents, or places for rent, or collects rent from real estate, or improvements thereon, for others as a whole or partial vocation. * * *''

So, under that statute, as in the Ohio act, a mere listing of real estate for sale is not prohibited.

 Mr. Hunter's contract constituted a ''listing'' of real property for sale. *Brown v. Gilpin,* 75 Kan. 773, 90 P. 267; *Zeligson v. Hartman-Blair, Inc.,* C. C. A. 10 Cir., 135 F. (2d) 874. Such listing being a violation of our statute, the contract was illegal and could not support a suit. Nor could such illegal contract afterwards be ratified. *Fewel & Dawes v. Pratt,* 17 Cal. (2d) 85, 109 P. (2d) 650, 654. From the Court of Appeals decision in the same case (103 P. (2d) 209), we quote:

'' * * * If the contract was invalid prior to the time of performance, the invalidity could not be cured by subsequently procuring a license. * * *''

 Respondent is dissatisfied with our construction of the phrase ''at the time the alleged cause of action arose''. We cited, among other authorities, a number of cases which had to do with venue and with statutes of limitation, not because either venue or limitation was involved in this case, but simply because the language of the cited opinions illustrated the distinction which must sometimes be made between the ''arising'' and the ''accruing'' of a cause of action. In this connection, respondent argues that a cause of action does not ''arise'' until there has been a breach of some duty owed to plaintiff by the defendant, and that a broker's employment contract which requires consummation of the sale and payment of the purchase price before a commission is earned or payable is not per-

formed until the sale is concluded and the price is paid. It may be conceded that, in one sense, both propositions are correct, in that no action can be maintained until the delict of the defendant has occurred. Respondent apparently believes that we intended to intimate that the broker's cause of action arises when he obtains his employment contract rather than when he commences to perform it, or completes its performance, or carries out the conditions contained in it which give him the right to recover his commissions. We did not so intend. We said that, in view of the legislative purpose, as it is to be gathered from a consideration of the statute as a whole, the expression "at the time the alleged cause of action arose" is to be interpreted as meaning at the time, or throughout the period, when the broker performed the services which culminated in the accrual of his cause of action. By this, we meant that the quoted expression did not refer to a particular moment of time when the cause of action accrued, but to the whole period covered by the rendition of the broker's services. We agree with appellant that "the alleged cause of action", under the statute in question, must mean the facts, alleged in the complaint, which constituted the entire transaction out of which the plaintiff seeks to recover—"the operative facts" showing the plaintiff's right and the defendant's delict. *Elliott v. Mosgrove,* 162 Or. 507, 540, 93 P. (2d) 1070. The cause of action may be said to have been "arising" throughout the period of the performance of plaintiff's services, although it did not "accrue" until the refusal of defendant to perform her part of the contract. It is in this sense that, with reference to pleading and proof, "cause of action" means the whole cause of action. With respect to venue and to the incidence of statutes of limitation

(matters with which we are not here concerned), a statute which speaks of the "arising" of a cause of action may refer only to the place where or to the time when the breach of the contract occurred which gave plaintiff the right to bring suit. *Shapiro v. McCarthy,* 279 Mass. 425, 181 N. E. 842, 844; *Stine v. Atkinson,* 69 Ohio App. 529, 44 N. E. (2d) 372, 374; *Tinker v. Sauer,* 105 Ohio St. 135, 136 N. E. 854, 856; *Bradford v. Southern Railway Co.,* 195 U. S. 243, 49 L. Ed. 178, 180, 25 S. Ct. 55; *United States v. Standard Oil Co.,* 21 F. Supp. 645, 660; *Wildman v. Wildman,* 70 Conn. 700, 41 A. 1, 3; *Norwood v. McDonald,* 142 Ohio St. 299, 52 N. E. (2d) 67, 72; *Durham v. Spence,* 6 L. R. Exch. 46; 1 C. J. S., Actions, section 8 (c).

■ Respondent contends that our construction of Hunter's contract of employment, wherein we held that he was not authorized or required to negotiate or consummate a sale, but merely to procure a purchaser with whom the owner should consummate a sale, is erroneous and not supported by the record. Moreover, he says that such construction is at variance with that placed upon the contract by the trial court and invited by appellant. As to this, the contract in suit was expressly pleaded by plaintiff-respondent as follows:

"That on or about the 15th day of October, 1938, the said Emily F. Gilchrist Wells and her said husband and agent, employed the plaintiff, by written agreement, to procure a purchaser for all of the timber lands then owned by Emily F. Gilchrist Wells in the Counties of Jefferson and Deschutes in Oregon, or portions thereof, by which agreement, the said deceased and her said husband and agent agreed to pay to the plaintiff, and he agreed to accept, a commission of five per cent on the total purchase price of any timber or timber lands sold through his efforts, for the said deceased, or which

might be sold by the deceased, to any purchaser procured by the plaintiff, with whom a sale should be consummated.''

It is evident, therefore, that plaintiff's undertaking was, as we said, to procure a purchaser. He had no authority, under the contract pleaded or under the evidence, to carry on negotiations with a prospective purchaser as an agent of the owner, or to consummate a sale. Clearly, his agency, under the pleadings and proof, permitted him only to ''display his wares'' to prospective purchasers, and entitled him to a commission only upon consummation of a sale by the owner. His argument that he was authorized to negotiate and consummate a sale is repelled by the evidence, which shows that, at his request, the owner submitted to him in advance the price and terms upon which a sale would be made. At no time was he authorized to vary the price or terms, although it is true that, in response to Brooks-Scanlon's first tentative offer, the owner did modify them. He never submitted to the owner any proposal on the part of Brooks-Scanlon to purchase on any prices and terms quoted by her. Some of the documentary evidence introduced by plaintiff proves his employment contract as pleaded, and some of it tends to prove a variance, but we think that he was bound by his pleading. The contract, as pleaded, was one of the type in which the broker is entitled to his commission when he produces a purchaser who is ready, willing and able to buy on terms previously authorized or subsequently ratified by the owner. The proof shows that Mr. Hunter so construed it, by requiring the owner to advise him in advance as to the price and terms which would be satisfactory to her. It may be conceded that the owner was aware that, in order to make a deal, Mr.

Hunter would necessarily have to negotiate with prospective purchasers, but, in so doing, it is obvious that he would be negotiating for the purpose of endeavoring to earn a commission for himself by producing a purchaser under the terms of his contract as pleaded, and not as an agent of the owner authorized, in her behalf, to negotiate and consummate a sale. It is true that, in instructing the jury, the trial judge said:

> "By the letters and telegrams the plaintiff undertook to find a buyer ready, willing and able to buy, and to consummate a deal for the timber satisfactory to owner."

We take it that thereby the court did not mean to inform the jury that Mr. Hunter was authorized to consummate a sale, but rather that he undertook to find a buyer and to consummate a deal satisfactory to the owner. There is an obvious distinction between the consummation of a "deal" by a broker and the consummation of a sale by an owner.

Respondent reiterates his argument that he performed substantial services after December 5, 1938, when he was licensed. It will be remembered that these alleged services consisted only in obtaining a written memorandum from Brooks-Scanlon's local officials, to the effect that they "would recommend" to their directors a purchase of Mrs. Wells's property upon substantially similar price and terms as those which they had, prior to December 5th, informed him they "would recommend". Respondent concedes that the two "tentative offers" were substantially the same, but makes the point that he became licensed in the interim! If this fact is of any significance, it must be upon the theory that, subsequent to the issuance of the license,

he procured a new contract from the landowner. No new contract, however, was pleaded, nor was any proved.

Having carefully reconsidered the law and the record, we are satisfied that our original opinion, as modified herein, should stand. The petition for rehearing is, therefore, denied.