Argued February 28, affirmed June 18,
reconsideration denied July 24, 1979

JOLMA, *Appellants*

*v.*

STEINBOCK, *Respondents*

(No. 424-330, CA 11573)

596 P2d 980

[658]

John S. Folawn, Portland, argued the cause for appellants. With him on the briefs were John H. Holmes, and Jensen, DeFrancq, Holmes & Schulte, Portland.

David A. Rhoten, Salem, argued the cause for respondents Abe L. Steinbock, Dorothy Steinbock, and Charlotte Blum, co-partners dba Cardinal Enterprises. With him on the brief was Rhoten, Rhoten & Speerstra, Salem.

Glenn H. Prohaska, Portland, argued the cause for respondents Daniel R. Adams; Curtis Walker; Aztec Empire Corporation, an Oregon corporation; Adams, Walker & Marlow, Inc., an Oregon corporation; Executive Management Corp., an Oregon corporation; and United Empires Corporation, an Oregon Corporation. With him on the brief was Day, Prohaska & Case, P.C., Portland.

[658-a]

Before Schwab, Chief Judge, and Buttler and Joseph, Judges.

BUTTLER, J.

## BUTTLER, J.

This action arises from a series of events beginning in December, 1970, and culminating in the sale of eight apartment building complexes on December 31, 1973, for $5.1 million and the subsequent resale of those buildings on the same day for $5.7 million. There are two groups of defendants: the Steinbocks and Ms. Blum, who were co-partners in Cardinal Enterprises, which owned the properties (Cardinal Enterprises); the remaining defendants (Adams *et al*)purchased the properties and resold them.

The plaintiffs are real estate brokers, presently licensed in the State of Oregon, with the exception of the John Shaw Company. Their claim against Cardinal Enterprises was in two counts, one for breach of contract by failing to pay a commission on the sale in accordance with an exclusive listing agreement, the other in *quantum meruit* for the reasonable value of services provided by plaintiffs. The claims against Adams *et al* were stated in two causes of action. The first, in four counts, alleged interference with contractual relations, intentional interference with business expectations, conversion and unjust enrichment. The second cause of action was for breach of a contract to share a sales commission. In addition to general damages, plaintiffs sought punitive damages against this group of defendants.

The cases against each group of defendants were segregated for trial, with the case against Adams *et al* heard first. At the conclusion of plaintiffs' case in chief, the court granted the motion of Adams *et al* for involuntary nonsuit. Plaintiffs appealed that judgment to the Supreme Court, which dismissed the appeal on the ground that it was premature in that the case against Cardinal Enterprises was still pending in the circuit court. Subsequently, the trial court granted Cardinal Enterprises' motion for summary judgment based upon the record in the first trial. Plaintiffs appeal from both of those judgments. We affirm.

In 1970, Cardinal Enterprises, a builder-developer, was a partnership whose principal assets consisted of eight apartment building complexes located in Salem, Corvallis and Albany. In November of that year, the partners, the Steinbocks and Blum, became interested in selling those properties and approached plaintiff McFarlane, who was then operating the John Shaw Company of Oregon, a business consulting firm which subsequently became the R. L. McFarlane Company. McFarlane, a C.P.A., was not at that time licensed to sell real estate.

On December 7, 1970, Cardinal Enterprises and McFarlane executed an agreement whereby he, as president of the John Shaw Company, agreed to undertake to sell the properties for Cardinal Enterprises for a commission. The agreement provided for a nonexclusive agency with no termination date. In May of 1971, McFarlane obtained his real estate license which authorized him to act as a salesman for plaintiff Lawrence N. Jolma, dba Lawrence N. Jolma Co., a licensed real estate broker. McFarlane enlisted the services in November, 1971, of Paul Zeger, a real estate salesman with plaintiff Bollons & Poss, Inc., also a licensed real estate broker. Up to this point, McFarlane had been gathering financial information and other data pertaining to the properties and had made efforts to sell them.

By early February, 1972, the plaintiffs, primarily Zeger of Bollons & Poss, had prepared a prospectus[1] to be used in conjunction with sale presentations to prospective purchasers, a copy of which, and of each subsequent update (approximately 10 in all) was given to Cardinal Enterprises. During the period from December, 1970, to December, 1973, plaintiffs were not able to sell the properties, although they made over

---

[1] The document characterized as a "prospectus" by the parties is a financial analysis of the aparment complexes both collectively and individually. It contains information relating to income, expenses, mortgage balances, net cash flow, lot size, a description of the apartments and amenities, and the sales price.

one hundred presentations and received several unacceptable offers.

In addition to the original letter agreement there were three supplemental letter agreements confirming the ongoing understanding between Cardinal Enterprises and the R. L. McFarlane Co. These supplemental agreements were executed on December 21, 1971, March 29, 1972, and January 9, 1973. The general terms of the four agreements are the same, with these exceptions: (1) the last three gave the Company exclusive rights to sell the properties for 90 days; (2) the second and third agreements exclude therefrom sales consummated by the Rawlins Realty Company for two specified apartments and any complex sold prior to a sale consummated by R. L. McFarlane Co. Those exceptions effectively nullified the exclusive nature of the second and third agreements. All of the agreements contained the following language:

> "Our exclusive rights shall extend to all prospective purchasers whom we have contacted and have identified to you for a period of one year from the date of the expiration of our agreement."

The evidence most favorable to plaintiffs indicates that on August 3, 1972, Zeger made a presentation of the Cardinal Enterprises properties to Adams and voluntarily provided him with a "prospectus." Adams told Zeger that neither he nor the corporate defendants were interested in buying any of the properties; however, he indicated he might be interested in doing something through an investment group. Zeger proposed that if such an approach were used, any commission be split equally among the three brokers (Jolma, Bollens and Poss and Adams). The record shows that if Adams agreed to work under such an arrangement it was on the condition that the three brokers have a six-month exclusive listing from Cardinal Enterprises. Such listing was never obtained.

In November of 1973, some 15 months after the August 3 meeting, a group of investors looking for tax

shelters contacted Adams. Because Adams was busy, defendant Walker undertook to locate suitable properties. He was informed by an employee of a bank which held one of Steinbock's mortgages that Cardinal Enterprises was selling its apartments. After being informed by Steinbock that the properties were still available, Walker and Adams, together with Steinbock, had several meetings to negotiate a sale. Financial information relating to the apartment complexes was given to Walker and Adams by Steinbock during these negotiations.

These negotiations culminated in the sale of Cardinal Enterprises' eight apartment complexes on December 31, 1973, to United Empires Corporation, a corporation formed by Adams *et al,* which in turn sold seven of the complexes to the investor group on the same day. The eighth complex was sold to others in September, 1974.

## I.  Summary Judgment

The motion for summary judgment for defendant Cardinal Enterprises was granted on the grounds that the listing agreement was illegal and void because McFarlane was not a duly licensed real estate broker at the time it was executed. Plaintiffs argue that there was a genuine issue of a material fact because there was evidence from which a jury could have found that McFarlane was acting as an agent on behalf of a licensed broker (Jolma) and that Cardinal Enterprises knew that the agreement was actually with that broker.

The Oregon statutes in effect during the relevant period provided in ORS 696.710:

> "No person engaged in the business of, or acting in the capacity of, a real estate broker within this state shall bring or maintain any action in the courts for the collection of compensation without alleging and proving that such person was a duly licensed real estate broker at the time the alleged cause of action arose."

[662]

A real estate broker was defined in pertinent part in ORS 696.010:

"* * * * *

"(8)'Real estate broker' means any person who, for another and for compensation or with the intention or in the expectation or upon the promise of receiving or collecting compensation:

"(a) Sells, exchanges, purchases, rents or leases real estate.

"(b) Offers to sell, exchange, purchase, rent or lease real estate.

"(c) Negotiates, offers, attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate.

"(d) Lists, offers, attempts or agrees to list real estate for sale."

"* * * * *

"(j) Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate.

"* * * * *

"(9) 'Real estate broker' also means any person employed by or on behalf of the owner of real estate at a stated salary or upon a commission or upon a salary and commission basis or other compensation to sell, exchange or offer for sale such real estate, or any part thereof, and who shall sell or exchange, or offer or attempt or agree to negotiate the sale or exchange of any lot or parcel of real estate.

"* * * * *"

Subsection (10) defined 'real estate salesman' as:

" 'Real estate salesman' means any person, who, for compensation or in the expectation or upon the promise thereof, is employed or engaged by a licensed real estate broker to do any act or deals in any transaction set out in subsection (8) of this section for or on behalf of such licensed real estate broker."

[663]

ORS 696.040[2] provided that the doing of any one of the acts described in subsection (8) or (9) of ORS 696.010 shall constitute the actor a real estate broker or salesman within the meaning of the statute.

Finally, ORS 696.020 provided:

"(1) No person shall engage in or carry on or advertise or hold himself out as engaging in or carrying on the business, or act in the capacity of, a real estate broker or a real estate salesman within this state without first obtaining a license as a real estate broker or a real estate salesman as provided for in this chapter.

"(2) A person who is licensed as a real estate broker or real estate salesman shall be bound by and subject to the requirements of ORS 696.010 to 696.490, 696.610 to 696.730 and 696.990 in doing any of the acts specified by subsection (8) or (9) of ORS 696.010:

"(a) While acting for another; and

"(b) While acting in his own behalf."

Violation of the statute is made a crime by ORS 696.990.

A contract which contravenes any provision of the statutes is void and there can be no entitlement to any commission based upon such a contract. *Miller v. Ziedrich et al,* 199 Or 505, 263 P2d 611 (1953); *Hunter v. Cunning,* 176 Or 250, 154 P2d 562, 157 P2d 510 (1944). Since neither McFarlane nor John Shaw Company, for whom he signed the agreement as president, was licensed as a broker or salesman at the time the initial agreement was executed the agreement was void and unenforceable. Plaintiffs, however, contend

---

[2] ORS 696.040 provided:

" * * * One act or transaction in consideration of compensation, by fee, commission, salary or otherwise, or with the intention or in the expectation or upon the promise of receiving or collecting a fee of the kind or nature described in the definition of a real estate broker in subsection (8) or (9) of ORS 696.010, whether the act is an incidental part of a transaction, or the entire transaction, shall constitute the person offering or attempting to perform the act or transaction a real estate broker or a real estate salesman within the meaning of this chapter."

[664]

that summary judgment was improperly granted because there were genuine issues of material facts which could avoid this result.

First, they claim that it was for the jury to decide whether McFarlane was licensed "when the cause of action arose," which they contend was not until sometime after McFarlane became a licensed real estate salesman, March, 1971, or broker, March, 1973. In the context of the statute, that question is one of law for the court to decide, not the jury. In *Hunter v. Cunning, supra,* the Supreme Court, when construing the language, "at the time the alleged cause of action arose," in the predecessor of ORS 696.710, held:

> " * * * [I]n view of the legislative purpose, as it is to be gathered from a consideration of the statute as a whole, the expression 'at the time the alleged cause of action arose' is to be interpreted as meaning at the time, or throughout the period, when the broker performed the services which culminated in the accrual of his cause of action. By this, we meant that the quoted expression did not refer to a particular moment of time when the cause of action accrued, but to the whole period covered by the rendition of the broker's services. We agree with appellant that 'the alleged cause of action', under the statute in question, must mean the facts, alleged in the complaint, which constituted the entire transaction out of which the plaintiff seeks to recover—'the operative facts' showing the plaintiff's right and the defendant's delict. *Elliott v. Mosgrove,* 162 Or. 507, 540, 93 P. (2d) 1070. The cause of action may be said to have been 'arising' throughout the period of the performance of plaintiff's services, although it did not 'accrue' until the refusal of defendant to perform her part of the contract. It is in this sense that, with reference to pleading and proof, 'cause of action' means the whole cause of action. With respect to venue and to the incidence of statutes of limitation (matters with which we are not here concerned), a statute which speaks of the 'arising' of a cause of action may refer only to the place where or to the time when the breach of the contract occurred which gave plaintiff

[665]

the right to bring suit. [Citations omitted]." 176 Or at 290-91.

It is apparent, as plaintiffs have contended, that this transaction involved an "ongoing business relationship" extending from the first agreement to the time of sale. Applying the rule of *Hunter,* any cause of action for a commission was in the process of arising throughout that entire period. The fact that the terms of the agreement were reiterated, supplemented and extended by Cardinal Enterprises after McFarlane was licensed does not cure the defect. *Hunter v. Cunning, supra,* 176 Or at 289. McFarlane must have been a licensed broker or a licensed salesman representing a broker *at the time* of the first act out of which the alleged cause of action arose; it is not enough that he became licensed later. *See Certified Realty v. Reddick,* 253 Or 617, 456 P2d 502 (1969).

■ Secondly, plaintiffs contend that there was evidence from which a jury could find that Cardinal Enterprises knew that McFarlane was acting for a disclosed principal who was a licensed broker. That argument also fails because, as discussed above, we must look to the beginning of the period during which McFarlane performed "broker's" services. His initial act in executing the listing agreement under which he was to act as representative for Cardinal Enterprises in the sale of the properties violated the statute because he was not licensed as a salesman even if he was, in fact, an agent for a licensed broker. Furthermore, the record discloses *no* evidence from which it could be found that Cardinal Enterprises knew that McFarlane was not acting for himself at the time of the first agreement. That contract, including all extensions of it, was void and plaintiffs may not recover a commission under it.

■ Plaintiffs' claim against Cardinal Enterprises for *quantum meruit* for the reasonable value of services provided must also fail. To allow plaintiffs to recover in *quantum meruit* would defeat the purpose of the

statute in that they would be recovering compensation which the statute forbids them to recover. As the Supreme Court said in *Hunter:*

"* * * If the act were construed otherwise, it would fail to render adequate protection to the public against the machinations of unscrupulous persons assuming, without a license, to act as brokers in defiance of law. This construction of the law prevents the absurdity of permitting such persons to recover compensation for criminal acts, while at the same time it affords the public the protection which it was the evident intention of the legislature to provide. Incidentally, it gives protection to ethical members of the broker's profession, who, having themselves complied with the law in letter and in spirit, would, under a loose interpretation, be subjected to competition by persons who had violated the law both in letter and in spirit." 176 Or at 283.

The trial court did not err in granting summary judgment in favor of defendants Cardinal Enterprises, Steinbocks and Blum.

## II. Nonsuit

Plaintiffs' second cause of action is against defendants Adams *et al* for intentional, willful, and malicious conduct which induced a breach of contract, interfered with business relations, converted materials and resulted in unjust enrichment to defendants. Also included was a count for breach of an agreement to share the broker's commission on the sale. Defendants were granted a judgment of involuntary nonsuit as to all of those counts.

■ In considering a motion for nonsuit, all evidence favorable to the plaintiff and all reasonable inferences therefrom must be taken as true. Reviewing the record in that light, we conclude that the trial court did not err in granting defendants' motion.

■ While it is clear that one who intentionally interferes with the performance of a contract between two or more persons by causing one of the parties not to

[667]

perform may be held liable in tort, *Sloan v. Journal Publishing Co.,* 213 Or 324, 358, 324 P2d 449 (1958), there is no liability where, as here, the contract is void or contrary to public policy.[3]

■ It is also the rule in this state that liability may be incurred if one, without a privilege to do so, induces or otherwise intentionally causes a third person not to continue a business relation with another. *American Sanitary Service v. Walker,* 276 Or 389, 554 P2d 1010 (1976). Such liability attaches even though the arrangement interfered with does not rise to the dignity of a contract. *Luisi v. Bank of Commerce,* 252 Or 271, 449 P2d 441 (1969). It is not necessary to examine the effect of the illegality of the underlying contract on this cause of action because under the facts before us, there is no basis for this claim even if the contract were valid and enforceable.

■ If we assume, arguendo, that the contract was valid, at the time that Adams *et al* negotiated the sale of the properties plaintiffs had only a *nonexclusive* right to sell. Absent an exclusive listing, Adams *et al,* and any other broker, had the privilege as a competitor of plaintiffs to induce Cardinal Enterprises to do their business with him rather than with his competitors.[4]

---

[3] Restatement (Second) of 4 Torts 53, § 774 provides:

"One who by appropriate means causes the nonperformance of an illegal agreement or an agreement having a purpose or effect in violation of an established public policy is not liable for pecuniary harm resulting from the nonperformance."

[4] Restatement (Second) of 4 Torts 39, § 768 provides:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

There was no legal obligation at that time for Cardinal Enterprises to deal only with plaintiffs. If the purchaser is one introduced to the sellers and who purchased within the one year period specified in the listing agreement quoted above, the claim would be against the sellers under the agreement, not against the purchasers.

■ Plaintiffs' claim against Adams *et al* for unjust enrichment is equally unfounded. The mere fact that plaintiffs introduced Adams *et al* to the Cardinal Enterprises properties and presumably gave them a "prospectus"some 16 months prior to the sale does not give rise to a right to share in the benefits that Adams *et al* reaped when they put together the sale. Again, at the time of the sale, plaintiffs and Adams *et al* were competitors and had the right to use information voluntarily given to them and to pursue potential sales. There was no showing of any improper conduct on the part of Adams *et al.*

■ With respect to the claim for conversion of the "prospectus," plaintiffs failed to establish any facts which support such a theory. The "prospectus" was given voluntarily to defendant Adams with no limitations on its use. It was also given to numerous other prospective purchasers. At the time of the sale, the "prospectus" claimed to have been converted was no longer accurate, having been updated many times. Furthermore, the information it contained was derived from Cardinal Enterprises and its records which plaintiffs collated and summarized.

■ Finally, the trial court did not err in granting a nonsuit on plaintiffs' cause of action against Adams *et*

"(d) his purpose is at least in part to advance his interest in competing with the other.

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

*See also Comments* to § 768.

*al* for breach of an agreement to share commissions. At best, the evidence shows only that such an arrangement was proposed. There is no evidence that defendants accepted the proposal. Plaintiffs' witness's own notes stated that Adams would be interested in such an approach only if he had an exclusive six months' listing. That was never obtained.

In summary, the contract was void; therefore, plaintiffs have no enforceable claim against Cardinal Enterprises for commissions either on express contract or in *quantum meruit* . Summary judgment for defendants was properly granted. With respect to Adams *et al,* the evidence, taken in the light most favorable to plaintiffs, does not support any of plaintiffs' claims, and a nonsuit against plaintiffs on those claims was properly granted. The judgments of the trial court were correct.

Affirmed.