Argued and submitted October 19, 1981, reversed and remanded for trial February 8, reconsiderations of respondents' Mt. Village, Bocek, and Grundeland, respondent Far West Federal and respondents' Gilbert and Christensen denied March 23, petitions for review denied June 9, 1982 (293 Or 235)

FRIEDMAN et al,
*Appellants,*

*v.*

MT. VILLAGE, INC. et al,
*Respondents.*

(No. A7610-15207, CA 18323)

640 P2d 1037

David B. Birenbaum, San Francisco, California, argued the cause for appellants. With him on the reply brief was Paul D. Karasoff, San Francisco, California.

Henry L. Bauer, Portland, argued the cause for respondent Far West Federal Savings and Loan Association. With him on the brief was Bauer, Murphy, Winfree & Schaub, P.C., Portland.

Thomas S. Moore, Portland, argued the cause for respondents Robert and Ruth Bocek, Mt. Village, Inc., and Roy Grundeland. With him on the brief was Richard Maizels, Portland.

Frederick T. Smith, Portland, argued the cause for respondents Kerry S. Gilbert and Paul E. Christensen. With him on the brief was David D. Park, Portland.

Gary I. Grenley, Portland, waived appearance for respondents Gilco Investment Partnership, Ted K. Gilbert, Property Management Services, Inc., and Dave Christensen, Inc.

Before Joseph, Chief Judge, Warren, Judge, and Holman, Senior Judge.*

HOLMAN, S. J.

---

\* Holman, S. J., *vice* Warden, J.

## HOLMAN, S. J.

This is a proceeding by which plaintiffs, a firm of architects, seek recovery on numerous contract and tort theories, arising out of the furnishing of architectural services. Plaintiffs appeal from a summary judgment for defendants.

On June 11, 1973, plaintiffs, residents of California, entered into a contract with an Arizona company to draw plans for a planned residential development on a specific piece of property in the city of Lake Oswego, Oregon. Plaintiffs were not licensed to practice architecture in Oregon and did not become so licensed until six months later on December 13, 1973. By that time, the plans were about 45 percent completed and plaintiffs had made two trips to Lake Oswego, one on July 25, to meet the city's department heads, and the other on November 6, to attend a City Council meeting. The Arizona firm ran into financial difficulties, and its development was not built. The record does not disclose the extent to which the plans were completed before the project was abandoned. The property was then placed on the market for sale and was sold to defendant Mt. Village in 1975.

By various documents executed between October 18, 1975, and January 29, 1976, Mt. Village entered into an agreement with plaintiffs for the use of the plans which had originally been drawn for the development by the Arizona firm. The agreements between plaintiffs and the Arizona firm and plaintiffs and Mt. Village both provided that the plans would remain the property of plaintiffs. Defendants Robert Bocek[1] and Ray Grundeland were the officers of Mt. Village, and they personally guaranteed the performance of the contract with plaintiffs and, in addition, individually guaranteed a note of Mt. Village to plaintiffs for $19,000 to secure part payment due under the agreement for the use of the plans. This agreement provided that Mt. Village should pay:

---

[1] Defendant Ruth Bocek's only connection with this case is as the wife of Robert Bocek.

"1. Our compensation for Basic Services including Structural Engineering [to] be allocated as follows:

"a. For salvable *[sic]* work previously done on the project.                              - $50,000.00

"b. For reimbursement of fees owed the previous Landscape Architect for work already done on planning, grading, tree removal, etc.
                                                    - $ 9,806.80

"c. Design of new clubhouse and construction drawings thereof, for completion of Construction Drawings, including Structural Engineering, for changes and modifications to drawings as previously discussed.                              - $25,000.00"

Thereafter Mt. Village, in turn, came upon hard times, and the project was taken over by defendant Far West Federal Savings & Loan Association, which had financed the project for Mt. Village. Far West then entered into an arrangement with the balance of defendants (hereinafter referred to as Gilbert/Christensen) either to complete or to purchase the project. The plans drawn by plaintiffs were used by Mt. Village and Gilbert/Christensen in building the project.

Plaintiffs' sixth amended complaint, which is the pleading relevant now, states a multiplicity of theories of recovery and relief. They are:

(1) Breach of contract against Mt. Village, Bocek and Grundeland.

(2) Action on the note against Mt. Village, Bocek and Grundeland.

(3) Action for fraud against Mt. Village, Bocek and Grundeland.

(4) Tortious interference with plaintiffs' written contracts and business relationships with Mt. Village and Far West against Bocek and Grundeland.

(5) Infringement of common law copyright because of the use of the plans against all defendants except Gilbert/Christensen.

(6) *Quantum meruit* against all defendants.

(7) Interference with plaintiffs' contract with Mt. Village and its prospective economic advantages against Far West and Gilbert/Christensen.

(8) Breach of contract against Far West as assignee of Mt. Village's right to receive construction loan payments.

(9) A permanent injunction against all defendants preventing them from using the plans, using the structures built on the project or representing that plaintiffs were the architects.

(10) An order impressing on the real property and the structures built thereon an equitable lien in favor of plaintiffs equivalent to the value that plaintiffs' design added to such real property.

The principal assignment of error concerns the trial court's ruling that plaintiffs could not prove a case under any of their allegations without reliance on the contract between plaintiffs and the Arizona firm, which was illegal and unenforceable. Defendants contended that plaintiffs are in no position to assert against defendants any rights arising out of the plans, because the presumption is that the plans are the property of the Arizona firm[2] that ordered them; and, further, that the contract between plaintiffs and the Arizona firm is void, as against public policy and, therefore, plaintiffs cannot assert the provisions of the contract retaining title to the plans in plaintiffs. Plaintiffs were not licensed to practice architecture in Oregon at the time they entered into the contract with the Arizona firm and during the time they performed about 45 percent of the work on the plans.

ORS 671.010(5) defines the practice of architecture as follows:

"Any one or combination of the following practices by a person: The planning, designing or supervision of the erection, enlargement or alteration of any building or of any appurtenance thereto other than exempted buildings * * * ."

---

[2] *Lin-Brook Builders Hardware v. Gertler,* 352 F2d 298 (9th Cir 1965).

The services performed by plaintiffs were not on an exempted building and came within the statutory definition. ORS 671.020(1) prohibits the unlicensed practice of architecture:

> "In order to safeguard life, health and property and to eliminate unnecessary loss and waste in this state, no person shall practice the profession of architecture * * * without first qualifying before the board and obtaining a certificate of registration * * *."

ORS 671.990[3] makes the unlicensed practice of architecture a misdemeanor, and ORS 671.220(1) makes it a violation subject to a civil penalty up to $1000. Payment for services performed while unlicensed may not be collected in Oregon courts. ORS 671.220(3) provides:

> "No person * * * practicing architecture is entitled to maintain a proceeding in any court of this state relating to services in practicing architecture unless it is alleged and proven that the person * * * was licensed to practice architecture under ORS 671.010 to 671.060, 671.080 to 671.120 and this section *at the time services were rendered."* (Emphasis added.)

■      Defendants urge that the entire contract is void and rely upon cases construing the statutes relating to the licensing of persons engaged in the sale of real estate. *See Certified Realty v. Reddick,* 253 Or 617, 623, 456 P2d 502 (1969); *Hunter v. Cunning,* 176 Or 250, 289, 154 P2d 562, 157 P2d 510 (1945); and *Jolma v. Steinbock,* 40 Or App 657, 664, 596 P2d 980, *rev den* 287 Or 409 (1979). These cases hold that no recovery may be had where listings of property for sale are taken at a time when no license exists, even though a license is subsequently secured before the property is sold. However, the statutes regarding the selling of real estate, while similar in many respects to those in question here, specifically define the selling of real estate as *including the taking of the listing.* The statutes involving the licensing of architects, on the other hand, *do not define the practice of architecture to include the making of a contract for architectural services.* It is only the *performance* of the contract *while unlicensed* that is prohibited. Therefore, the contract with the Arizona firm was not

---

[3] ORS 671.990 was amended to delete misdemeanor provision by Oregon Laws 1977, chapter 803, section 17.

illegal and void, even though payment for the services performed for the Arizona firm while unlicensed are not collectible in Oregon. The provision retaining the title to the plans in plaintiffs is valid.

■    The major question is whether plaintiffs may use the performance of their second contract, the one with Mt. Village, as a basis for recovery. At the time this contract was entered into, plaintiffs had been licensed in Oregon for two years. It can be argued, on the one hand, that recovery at any time for the use of the plans would offend the legislative policy, because their use at any time would pose the danger which is sought to be avoided. The use of plans drawn by unqualified persons do not become less dangerous to persons and property by reason of the passage of time or the subsequent licensing of those who drew them. On the other hand, it can be argued that the second agreement with Mt. Village, made when plaintiffs had been fully qualified for two years, had provisions which are a sufficient guarantee that the plans when used would be the product of qualified persons. These provisions were:

"Approximately 300 apartments

"Recreation Building of approximately 2,000 - 2,500 square feet.

"I.   COMPLETION OF CONSTRUCTION DOCUMENTS

"A.   *On the basis of drawings previously prepared for the property,* we shall do the following:

"1.   *Complete the Architectural and Structural Working Drawings and Specifications which set forth in detail the requirements for construction of the project.*

"2.   Make changes to the Working Drawings to eliminate one building type and other modifications already discussed.

"3.   *Provide design for a new club house* and provide Architectural and Structural Working Drawings and Specifications of said facility.

"4.   Consultation and coordination with your civil engineer, your landscape architect, your contractor and his sub-contractors.

"II.  BIDDING AND CONSTRUCTION PHASE

"A.   Following our completing of Working Drawings and Specifications we shall:

"1.  During construction of the project, we will make periodic visits to the site to observe the progress of the work only for conformance with the design concept of the project and for visual conformance with the contract drawings, provided however, that we shall not be required to perform full-time supervision and we shall not be responsible for the work of the contractor or his sub-contractors.

"2.  We shall interpret the drawings and specifications as requested or required and if necessary, shall issue revised and/or additional drawings as to clarify or define the scope of work and review shop drawings and other submissions.

"3.  We shall perform any other services that are requested or become necessary during the construction phase including architectural and structural work." (Emphasis added.)

Most certainly the design for a new clubhouse and drawing of its plans were to be by qualified persons. We conclude that the provision of the contract for completion of the "Architectural and Working Drawings and Specifications which set forth in detail the requirements for construction of the project" is a sufficient guarantee that the final plans would be the product of persons qualified to practice architecture under Oregon law. We so conclude despite their being based upon plans that were partially completed while plaintiffs were unqualified to practice architecture in Oregon. The trial court was in error in granting summary judgment.

Plaintiffs also contend the trial court erred in sustaining Far West's and Gilbert/Christensen's demurrers to plaintiffs' cause of action for interfering with plaintiffs' contract with Mt. Village and any business advantages derivable therefrom. In the usual interference with a contract case the person interfering is a complete stranger to the contractual relationship. In this case, plaintiffs have alleged that Far West and Gilbert/Christensen were joint venturers with Mt. Village in Mt. Village's construction of the planned residential development, and this allegation was the basis for sustaining the demurrers.

If persons have a community of interest in an undertaking, they are normally not responsible on an interference with contract basis for actions which promote the

benefit of the community, because they owe a duty to other members of the community to promote the community's interest. Actions taken for the benefit of the community in an interference with contract context are sometimes spoken of as "privileged" or taken in "good faith." *See Wampler v. Palmerton*, 250 Or 65, 75-77, 439 P2d 601 (1968). *Wampler* concerned liability of corporate officers and employees for causing breaches of the corporation's contracts, but the opinion is, nevertheless, applicable by analogy in a joint venture situation.

■     Plaintiffs argue that a person could be a joint venturer with Mt. Village and still not be responsible with Mt. Village on the contract with plaintiffs, because joint venturers, among themselves, may have different rights and obligations as to third parties which are determined by their agreement of joint venture. Even if this be so, the community of interest alleged by plaintiffs in the completion of the project places a duty upon the joint venturers to protect the community and to act for its benefit to complete the purpose of the venture, and they are not responsible in tort for actions for which they would not have been so responsible had they actually been parties to the contract with plaintiffs. *Wampler v. Palmerton, supra,* 250 Or at 77. We conclude that defendants' alleged actions in interfering with the contract between their co-venturer and plaintiffs, which contract concerns the interest of the joint venture, comes within the rule of *Wampler.*

■     There is another reason why the demurrers should have been sustained. Plaintiffs allege that Mt. Village and its officers and organizers found themselves unable to continue with the project in July, 1976. They also alleged that in September, 1976, defendants Far West and Gilbert/Christensen interfered with Mt. Village's contract with plaintiffs in that they thereafter prevented them from making payments, changed the plans and used them in such changed condition. There can be no interference with the performance of a contract which the party claimed to have been interfered with can no longer perform in any

event. The trial court did not err in sustaining the demurrers.[4]

### Reversed and remanded for trial.

---

[4] Plaintiffs have the intestinal fortitude to contend that the trial judge abused his discretion in failing to allow them to amend their *sixth* amended complaint. They complain bitterly that they are not being given a trial on the merits even though they have spent "tens of thousands" of dollars preparing this case. Plaintiffs have taken the problem of whether defendants are responsible for the use of their plans and have attempted to vault their claims into some sort of tort claim where damages are not strictly structured and punitive damages are available. The trial court file is nine inches thick. There comes a time when litigants, and the public through its support of the court system, have to be protected from the cost of such prolixity as is demonstrated here. If the trial court abused its discretion, it was in letting plaintiffs amend as often as it did. The hours of court and lawyers' time the file in this case represents is stupendous. This method of litigating (which is limited only by one's imagination) ultimately clogs the court system and can destroy it. The assignment of error is not well taken.