Argued and submitted August 27, 2004, affirmed February 8, 2006

Joseph H. EUSTERMAN, M.D.,
*Appellant,*

*v.*

NORTHWEST PERMANENTE, P.C.,
an Oregon professional corporation;
and Kaiser Foundation Health Plan of the Northwest,
dba Kaiser Pemanente,
an Oregon corporation,
*Respondents.*

0004-03269; A120010

129 P3d 213

Donald B. Potter argued the cause and filed the briefs for appellant.

James N. Westwood argued the cause for respondents. With him on the brief were Chris Kitchel, Hilary L. Barnes, and Stoel Rives LLP.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

ORTEGA, J.

## ORTEGA, J.

Plaintiff, a physician, appeals a summary judgment in favor of defendants Northwest Permanente, P.C. (Northwest), plaintiff's former employer, and Kaiser Foundation Health Plan of the Northwest (Kaiser), a provider of managed care services. In essence, plaintiff's theory is that Northwest terminated his employment because of defendants' concerns about his approval of time off for injured workers, his changes in other doctors' diagnoses, and his efforts to obtain an osteopathic treatment for a patient, and that such concerns were motivated by finances, not medical judgment. Plaintiff claims that Northwest wrongly discharged him because he fulfilled public duties relating to patient care and that Kaiser tortiously interfered with his employment contract with Northwest. Because we conclude that plaintiff failed to establish an essential element of each of his claims—the existence of a public duty to support his wrongful discharge claim and the existence of improper means or an improper motive to support his claim for intentional interference with economic relations—we affirm.

This appeal arises from a summary judgment, so we view the facts and inferences in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C. The record, viewed in the light most favorable to plaintiff, contains the following facts.

Northwest is a professional corporation of medical doctors. It had a contractual relationship with Kaiser, under which Northwest was exclusively responsible for the provision of all medical services that Kaiser required. As relevant here, Kaiser, in turn, contracted with employers and insurers to have Northwest physicians provide medical care services for injured workers.

Plaintiff was one of the physicians who provided those occupational health services. Plaintiff was a *locum tenens* physician, which meant that he did not have patients of his own but filled in and provided outpatient care when a patient's primary physician was unavailable. He worked for Northwest for 14 months under a series of term contracts that, among other provisions, allowed for his termination

without cause on 30 days' notice or with 30 days' pay. The contract also gave Northwest medical staff the right to determine the manner in which plaintiff would provide treatment.

The vast majority—about 90 to 95 percent—of plaintiff's patients were seeking treatment for workplace injuries covered by workers' compensation insurance. When an injured worker was unable to return to work for a period of time, Northwest doctors were to approve time off or "time loss days." Kaiser uses information about time loss days authorized by its associated physicians to sell its managed care services to insurers such as the State Accident Insurance Fund (SAIF). Defendants communicated to plaintiff and other Northwest doctors that a low incidence of time loss days was financially advantageous for Kaiser. For example, about six months before plaintiff's employment ended, plaintiff and others, including Kaiser case managers, attended a meeting in which, according to the minutes, they were told that "our time loss days have again increased," making Kaiser less competitive with other managed care organizations.

Because of the attention that defendants paid to time loss, plaintiff felt pressured to release workers to return to work earlier than he deemed appropriate. Kaiser case managers automatically became involved when a doctor approved time loss of more than 10 or 20 days. During his employment, plaintiff was given a memo (dated three years before the start of his employment) that announced a contract between Kaiser and SAIF for managed care services and stated, "We are now at FINANCIAL RISK for the time loss we authorize. Please authorize time off work only if it is MEDICALLY NECESSARY." (Emphasis in original.) Kaiser sent monthly reports to all Northwest physicians that summarized each doctor's time loss authorizations. An explanation at the top of the reports states:

> "This is routine information we are providing for our SAIF Corporation [managed care] contract. Every month all clinicians who have seen SAIF covered workers and who have authorized time loss will receive this report. We are not attempting to assess medical appropriateness of these [time loss days] but are providing the information so you can assess it. Please authorize only medically necessary

time loss. Rapid return to work speeds recovery and reduces costs. If the worker can be released to light duty, please do so. Thanks."

Plaintiff perceived these reports as a form of pressure. On occasion, plaintiff told some of his colleagues that he felt that money was too much of a concern.

Plaintiff also was involved in some disputes regarding the appropriate diagnoses and treatment plans for patients. He and other doctors disagreed about whether one patient had a degenerative, employment-related condition and about when another patient's finger splint should be removed. Plaintiff was once told that he would not be allowed to see a particular patient unless he agreed not to change the patient's diagnosis or treatment plan, although he did eventually see the patient despite his refusal to assent to such an agreement. On another occasion, plaintiff changed another doctor's diagnosis from tendinitis to carpal tunnel syndrome; plaintiff believed that objections to that change in diagnosis were motivated by anger about the additional time loss. In e-mail messages regarding two patients, Kaiser employees wrote to plaintiff's superiors at Northwest to question his diagnoses and treatment plans.

Plaintiff also was involved in disputes regarding the use of a procedure called osteopathic manipulative treatment (OMT). Although Northwest's and Kaiser's written policies did not prohibit the use of OMT, plaintiff's superiors, Drs. Thiessen and McDonald, eventually instructed him not to use it. Plaintiff's superiors had a negative view of OMT and believed it could be dangerous for plaintiff to perform it. Plaintiff acknowledges that Northwest could forbid his performance of OMT, and he did not use the procedure after being told not to do so. Nevertheless, plaintiff wanted to refer a patient to an external doctor of osteopathy for OMT and was frustrated when his superiors told him that, if a patient could be seen internally, the patient could not be referred externally. Plaintiff knew of no one within Northwest who provided OMT.

Shortly before plaintiff's termination, he met with Thiessen and McDonald to discuss OMT. Soon after the

meeting, Thiessen and McDonald decided to terminate plaintiff's contract. Their decision was ratified in a meeting of an occupational medicine group that included Kaiser employees, and plaintiff's employment was terminated the next day. According to plaintiff, when McDonald informed plaintiff of his termination, he stated that one or two Kaiser case managers had insisted that plaintiff be terminated, even though McDonald thought plaintiff was an excellent doctor and had tried to keep him on.

In response to his termination, plaintiff asserted tort claims against Northwest and Kaiser, and they filed motions for summary judgment. The trial court found that, with regard to the wrongful discharge claim against Northwest, plaintiff had failed to identify any public duty or employment-related right that could be the basis for a wrongful discharge claim and also had failed to introduce evidence that Northwest's termination decision was motivated by anything other than its concerns about plaintiff's performance. Regarding plaintiff's claim against Kaiser for intentional interference with economic relations, the trial court found no evidence on three essential elements: that plaintiff's termination was wrongful, that Kaiser interfered with plaintiff's employment relationship with Northwest, and that Kaiser acted with any illegal or improper motive. Plaintiff assigns error to the resulting grants of summary judgment to Northwest and Kaiser.[1] We affirm.

We first address the wrongful discharge claim. The tort of wrongful discharge stands as an exception to the usual rule that at-will employees can be discharged at any time for any reason. *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). We recognize two general types of wrongful discharge: (1) discharge for exercising a job-related right that reflects an important public policy (such as filing a workers' compensation claim, *see Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978)), and (2) discharge for fulfilling an important public duty (such as serving on a jury, *see Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975)). This court cannot

---

[1] Plaintiff also assigns error to the trial court's denial of his motions to compel. On that issue, we affirm the trial court's decisions without discussion.

create a public duty but must find one in constitutional or statutory provisions or case law. *Babick*, 333 Or at 407-08. To establish a duty, statutes cannot merely express a general public policy; rather, they must encourage specific acts or "otherwise demonstrat[e] that such acts enjoy high social value." *Id.* at 409.

■ As a preliminary matter, Northwest contends that, because of plaintiff's employment contract, he cannot bring a wrongful discharge claim but rather is limited to any remedies provided in his contract. We reject that argument. As we concluded in *Dunwoody v. Handskill Corp.*, 185 Or App 605, 609, 60 P3d 1135 (2003), "the existence of a contractual relationship does not, by itself, foreclose a plaintiff from bringing a claim for common-law wrongful discharge." The tort is still allowed where the contractual remedy does not "adequately redress the alleged injury." *Id.* at 614. Here, the employment contract between plaintiff and Northwest allowed either party to terminate the relationship "at any time, without cause * * *." Plaintiff was terminated according to the terms of the contract, which required 30 days' written notice or 30 days' pay with immediate termination. As in *Dunwoody*, there is substantial divergence between any tort remedies and the contractual remedy. Accordingly, the existence of an employment contract does not foreclose plaintiff's wrongful discharge claim.

■ We next consider whether plaintiff's wrongful discharge claim is legally sufficient. Here, plaintiff asserts that he was fulfilling a public duty.[2] Plaintiff characterizes the following as protected activities:

> "authorizing time loss benefits and modified work days in amounts greater than [d]efendants and their employer/ insurer 'customers' wanted; referring patients outside of [d]efendants' system for necessary care unavailable within; and making correct diagnoses based on his medical judgment that [d]efendants and their employer/insurer clients wanted to avoid."

---

[2] Plaintiff has labeled his claim as involving job-related rights "and/or" public duties. However, all or nearly all of his allegations are more properly characterized as referencing public duties; as described by plaintiff, they involve obligations that he was required to fulfill, rather than benefits that he was entitled to as an employee. Accordingly, our analysis is framed in terms of public duties.

Plaintiff relies on three groups of statutes—concerning health insurance, regulation of physicians, and workers' compensation—in support of his argument.[3] None of the statutes encourages the specific acts identified by plaintiff; indeed, most of the statutes do not, by their terms, even apply to the situations described by plaintiff. Accordingly, the statutes do not create a public duty that could support his wrongful discharge claim. We examine each group of statutes in turn.

Pointing to health insurance statutes, plaintiff relies on provisions of ORS chapter 743: ORS 743.803(2)(e) and (f), ORS 743.829, and ORS 743.834. Plaintiff contends that those statutes create a public duty more specific than did the statutes at issue in *Babick*. However, because specific limitations in those statutes make them inapplicable to plaintiff's situation, none of them creates a duty relevant to this case.

■ ORS 743.803(2), which establishes requirements for "medical services contract[s]" between insurers and providers,[4] is inapplicable for at least two reasons. First, under ORS 743.801(10), a medical services contract "does not include a contract of employment," such as the contract under which plaintiff was employed by Northwest. The legislature thus chose to address the relationship between insurers and providers, but to exclude employment relationships. In light of that express limitation, we cannot conclude that the statute creates any public duty or employment-related right applicable in this case. Second, under ORS 743.811, ORS

---

[3] Plaintiff's employment was terminated in 1998. Since then, some of the statutes that the parties cite have been amended, some more than once. Given the way the parties frame their arguments, however, we do not understand the various amendments to affect our analysis in this case. Accordingly, for convenience, all statutory references are to the 2003 versions.

[4] The portions of ORS 743.803(2) on which plaintiff relies are as follows:

"A medical services contract shall:

"* * * * *

"(e) Provide that a doctor of medicine or osteopathy licensed under ORS chapter 677 shall be retained by the other party to the medical services contract and shall be responsible for all final medical and mental health decisions relating to coverage or payment made pursuant to the medical services contract.

"(f) Provide that a physician who is practicing in conformity with ORS 677.095 may advocate a decision, policy or practice without being subject to termination or penalty for the sole reason of such advocacy."

743.803 does not apply to medical services contracts for services provided under the Workers' Compensation Law. According to plaintiff, 90 to 95 percent of his patients were injured workers covered by workers' compensation insurance; ORS 743.803 could not create any duty pertaining to those patients and, indeed, plaintiff has not identified any examples of conflicts with his supervisors at Northwest that involved patients outside the workers' compensation context.[5]

Similarly, ORS 743.829, which addresses decisions about care provided in a "health care facility,"[6] and ORS 743.834, which addresses information and referrals provided to patients,[7] are inapplicable because those statutes limit only the actions that an "insurer" may take against a provider.[8] We do not understand plaintiff to argue that Northwest is an

---

[5] Although the parties did not address ORS 743.811, we may do so. "In construing a statute, th[e] court is responsible for identifying the correct interpretation, whether or not asserted by the parties." *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997).

[6] ORS 743.829 provides:

"(1) All clinical decisions regarding length of stay in a health care facility as defined in ORS 442.015, transfer between levels of care and follow-up care shall be the decision of the treating provider in consultation with the patient, as appropriate.

"(2) An insurer may not terminate or restrict the practice privileges of any provider solely on the basis of one or more decisions made pursuant to subsection (1) of this section."

[7] ORS 743.834 provides, in part:

"No insurer may terminate or otherwise financially penalize a provider for:

"(1) Providing information to or communicating with a patient in a manner that is not slanderous, defamatory or intentionally inaccurate concerning:

"(a) Any aspect of the patient's medical condition;

"(b) Any proposed treatment or treatment alternatives, whether covered by the insurer's health benefit plan or not; or

"(c) The provider's general financial arrangement with the insurer.

"(2)(a) Referring a patient to another provider, whether or not that provider is under contract with the insurer."

[8] Furthermore, ORS 743.829 applies to decisions regarding care in "a health care facility as defined in ORS 442.015"—that is, "a hospital, a long term care facility, an ambulatory surgical center, a freestanding birthing center or an outpatient renal dialysis facility." ORS 442.015(16)(a). We do not understand plaintiff to allege that his activities involved care provided in such a facility, so ORS 743.829 is inapplicable for that reason as well.

"insurer" within the meaning of the statutes.[9] *See* ORS 743.801(8) (defining "insurer").

Plaintiff thus has not introduced any evidence of conduct that would fall within the cited provisions of ORS chapter 743. Because the legislature chose to limit expressly the application of ORS chapter 743, we do not find in those statutes a public duty applicable to any of plaintiff's conduct. *See Dymock v. Norwest Safety Protective Equipment*, 334 Or 55, 60, 45 P3d 114 (2002) (where a statute declared certain noncompetition agreements void and barred courts from enforcing them but did not confer a right to refuse to sign such agreements, refusal to sign an agreement could not support a wrongful discharge claim).

■ Next, plaintiff points to statutes relating to regulation of physicians in ORS chapter 677. He argues that those statutes protect his actions of changing other doctors' diagnoses, using OMT before being instructed not to do so, and authorizing time loss days. ORS 677.095(1) provides, in part, that a doctor "has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians" in comparable circumstances. ORS 677.190(1)(a) provides that the Board of Medical Examiners may suspend or revoke the license of a doctor for unprofessional or dishonorable conduct, which ORS 677.188(4)(a) defines to include conduct or practices that violate ethical standards or that might endanger patients or impair a physician's ability to practice medicine safely and skillfully. Those statutes are too general to create a public duty applicable under these particular circumstances.

In *Babick*, the court concluded that a public concern about private law enforcement does not establish a duty for private security guards to arrest law-breaking concert-goers and that a statutory scheme for licensing private security guards "does not suggest that the activities of private security personnel enjoy any higher social value than the activities of employees in other professions to which the at-will rule applies." 333 Or at 410. Here, as in *Babick*, the cited statutes

---

[9] At oral argument, plaintiff's counsel indicated that Kaiser was an insurer. He did not argue that *Northwest* was an insurer but argued that the statutory policies expressed in ORS chapter 743 nevertheless should apply to Northwest.

do not establish a public duty to perform the specific activities that plaintiff identifies as the cause of his termination or otherwise demonstrate that those acts enjoy a sufficiently high social value to exempt them from the at-will employment rule.

For purposes of our analysis, we assume that the statutes regulating physicians create a duty to practice medicine ethically and non-negligently. Plaintiff introduced his own and another doctor's testimony that, "to use that degree of care, skill and diligence that is used by ordinarily careful physicians[,]" a doctor must exercise his independent professional judgment. Plaintiff argues that, to comply with that standard, he had to exercise his professional judgment to authorize time loss days, make referrals for OMT, and change other doctors' diagnoses. We assume, then, that plaintiff was complying with the duty of care required by the statutes at issue, but that assumption does not end our analysis.

The question here is whether the duties established by the statutes are of the type that provide a basis for a wrongful discharge claim. Rather than establish duties to perform specific acts, as required by *Babick*, the statutes at issue here contemplate an exercise of professional judgment that may be satisfied by a range of acts. In fact, doctors can and do disagree about what specific acts are required in particular circumstances. The statutes regulating physicians do not contemplate that a doctor is immunized from all review or criticisms of his decisions so long as the doctor believes that he is providing the correct care. *See, e.g.*, ORS 677.265(1)(c) (Board of Medical Examiners shall determine whether a doctor used the appropriate degree of care in providing medical services). To whatever extent plaintiff had a duty to use his professional judgment, other doctors at Northwest, including the doctors whose diagnoses plaintiff changed, also had the duty to use their professional judgment when they disagreed with plaintiff. Plaintiff acknowledged that Northwest had the right to review his decisions and ensure that he provided services in a satisfactory way.

Nothing in the record suggests that the other Northwest doctors acted contrary to their own professional

judgment or that, even when case managers complained about plaintiff's diagnoses, those complaints were made to anyone except other doctors. This is not a case in which—to imagine an example—one doctor wanted to treat a patient's heart attack while another doctor or administrator chose to throw the patient out on the street. On the record in this case, although plaintiff may have had a duty to exercise his professional judgment, other doctors had no duty to agree with him, nor did Northwest have an obligation to accept plaintiff's judgment over the judgment of its other doctors. In all events, nothing in the statutes regulating physicians supports the kind of duty that would so immunize one physician's exercise of professional judgment from review by others that it would exempt the physician from the at-will employment rule.

■ Finally, plaintiff relies on provisions of ORS chapter 656 that address insurers' obligations under the Workers' Compensation Law. He argues that ORS 656.245 and ORS 656.262 create public duties for him to provide injured workers with whatever medical services he deemed necessary. However, the cited statutes provide no support for that alleged public duty. ORS 656.245(1)(a), which requires workers' compensation "insurers" to provide medical treatment for compensable injuries,[10] has nothing to say about a physician's duty to use his independent medical judgment to render diagnoses or treatment plans. ORS 656.262(4)(g) provides that an insurer need not pay temporary disability compensation unless it is authorized by a practitioner.[11] According to plaintiff, that statute implies that a physician treating a workers' compensation patient has particular duties toward that patient. However, our case law does not support an exemption from the at-will rule based on such vague implications; ORS 656.262(4)(g) does not suggest a duty to perform any specific act or otherwise demonstrate

---

[10] ORS 656.245(1)(a) provides, in part:

"For every compensable injury, the insurer * * * shall cause to be provided medical services for conditions caused in material part by the injury for such period as the nature of the injury or the process of the recovery requires * * *."

[11] ORS 656.262(4)(g) provides, in part:

"Temporary disability compensation is not due and payable * * * after the worker's attending physician * * * ceases to authorize temporary disability or for any period of time not authorized by the attending physician * * *."

that a physician's actions under workers' compensation law enjoy a higher social value than the activities of employees in other professions to which the at-will rule applies, as required under *Babick*. The workers' compensation statutes simply do not establish a public duty of the sort that plaintiff asserts. Because plaintiff has failed to show that the acts for which he was terminated constituted performance of a cognizable "important public duty," the trial court did not err in entering summary judgment in favor of Northwest on the wrongful discharge claim.

■■■■ We next turn to plaintiff's claim against Kaiser for intentional interference with economic relations. To establish such a claim, a plaintiff must demonstrate:

> "(1) the existence of a valid business relationship or expectancy, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to economic relations, and (6) damages."

*Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 651, 891 P2d 639 (1995) (citations omitted). When a plaintiff's claim is based on an improper purpose, that purpose must be to inflict injury on the plaintiff. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 498, 982 P2d 1117 (1999). "And, if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Id.* (citation omitted). Here, we conclude that plaintiff's claim fails as to the fourth element, an improper means or purpose.

We begin with a preliminary matter: whether Kaiser was a third party who could be liable for interference with the contract between plaintiff and Northwest. In arguing that it was not because it shared a "common interest" with Northwest regarding the provision of medical services, Kaiser reads too much into two of our prior decisions. First, in *Oregon Life and Health v. Inter-Regional Financial*, 156 Or App 485, 488, 967 P2d 880 (1998), *rev dismissed*, 329 Or 10 (1999), some Oregon citizens had purchased annuities from a

company that eventually collapsed, and the plaintiff, a statutory guarantor, paid the purchasers' losses. The plaintiff claimed that the defendants (companies connected with the company that had sold the annuities) tortiously interfered with its economic relationship with its members, and we rejected that claim. The plaintiff was "a creature of statute, and comprise[d] the life and health insurance companies doing business in Oregon" and charged with paying the cost of lost investments in the case of insolvency. 156 Or App at 488 n 1; *see also* ORS 734.800. We held that the plaintiff could not sue for intentional interference with the relationship between it and its members because they were a single entity. 156 Or App at 498. Kaiser's attempt to argue that Northwest and plaintiff likewise were a single entity merely because plaintiff functioned as an agent of Northwest finds no support in *Oregon Life and Health*; the relationship between plaintiff and Northwest is in no way similar to the statutorily created relationship between the plaintiff guarantor in that case and its members.

■ Second, Kaiser relies on *Friedman v. Mt. Village, Inc.*, 55 Or App 1018, 640 P2d 1037, *rev den*, 293 Or 235 (1982). There, the plaintiffs sued joint venturers for interfering with the plaintiffs' contract with another member of the joint venture. Among our reasons for affirming dismissal of the plaintiffs' claim, we noted that the defendants were privileged to interfere with a contract between their coventurer and the plaintiffs where the contract concerned the interest of the joint venture. *Id.* at 1026. In this case, however, the record does not indicate, and plaintiff has not alleged (as did the plaintiffs in *Friedman*), that defendants are engaged in a joint venture; Kaiser simply has a contract with Northwest for provision of all medical services that Kaiser requires. The mere presence of such a contract and some shared interests does not transform the contracting parties into a single entity for purposes of an intentional interference claim. *See Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 382-83, 879 P2d 1288 (1994), *rev dismissed*, 321 Or 511 (1995) (the defendant's ownership of stock in the plaintiff's employer, by itself, did not make the defendant a party to the plaintiff's employment contract and shield the defendant from liability for interfering with the contract). Kaiser cannot establish as

a matter of law that it was not a third party to the relationship between plaintiff and Northwest.

■ We turn, then, to plaintiff's theory about Kaiser's motives or means. In his second amended complaint, plaintiff alleged that two Kaiser case managers interfered with his employment contract "in substantial part" because of his exercise of independent medical judgment regarding diagnoses and treatment and his advocacy of the position that other doctors should be allowed to exercise their medical judgment. That complaint characterized Kaiser's conduct as interference "for improper purposes and/or through improper means," but plaintiff's arguments all focus on Kaiser's motive, which, he claims, was to maximize its profits. However, such a motive is not improper. *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 210-12, 582 P2d 1365 (1978). As in *Top Service*, it is not improper for a defendant to interfere in a manner "wholly consistent with [its] pursuit of its own business purposes as it [sees] them * * *." 283 Or at 212.

Using the same reasoning that he applies to public duties under ORS chapters 656, 677, and 743, plaintiff also argues that Kaiser's motives were wrongful because Kaiser's interference was motivated by plaintiff's "protected activity." In other words, plaintiff seems to argue that Kaiser wished to increase its profits in ways that were unlawful. That argument actually speaks less about Kaiser's motives than about its means, though plaintiff does not frame it as such. However, plaintiff here has not adequately shown that those means—apparently, urging or insisting that plaintiff be fired for his allegedly protected activities "violate some objective, identifiable standard, such as a statute or other regulation * * *." *See Northwest Natural Gas Co.*, 328 Or at 498. Without such a showing, plaintiff's intentional interference claim fails.

We have already concluded that the statutes on which plaintiff relies do not establish that the actions that plaintiff claims were the basis for terminating him were protected activity, thus rendering Northwest's termination decision wrongful. For the same reasons, those statutes cannot establish that Kaiser's influence on plaintiff's termination violated some objective, identifiable standard. Plaintiff has

not argued that the statutes apply any differently in evaluating Kaiser's actions, but because some of his arguments on wrongful termination seem to apply more properly to Kaiser than to Northwest, we address the statutes again only to that limited extent and otherwise conclude that the statutes that plaintiff cites do not support an argument that Kaiser used wrongful means to interfere with plaintiff's employment.

First, we note that plaintiff has failed to produce any evidence that Kaiser's actions violated ORS 743.834, which protects a doctor's ability to discuss treatment alternatives with patients and refer them to other providers.[12] Plaintiff has introduced evidence of only one instance, when he proposed a referral for OMT, to which the statute might apply. However, plaintiff presents no evidence that Kaiser objected to the OMT referral at all, let alone that it interfered with his employment on that basis. Accordingly, we reject that argument without further discussion.

Second, we note that, although the workers' compensation statutes cited by plaintiff establish that an insurer must provide treatment authorized by a medical provider, they do not require insurers to provide, without question, any treatment recommended by any physician.[13] Plaintiff has not

---

[12] As relevant here, ORS 743.834 provides:

"No insurer may terminate or otherwise financially penalize a provider for:

"(1) Providing information to or communicating with a patient * * * concerning:

"* * * * *

"(b) Any proposed treatment or treatment alternatives, whether covered by the insurer's health benefit plan or not; * * *

"* * * * *

"(2)(a) Referring a patient to another provider, whether or not that provider is under contract with the insurer."

[13] Plaintiff argues that various statutes establish that it is improper for an insurance company to attempt to influence a physician's diagnoses and treatment decisions for an insured patient in order to reduce costs. Even if we were to accept that argument, no reasonable jury could conclude that Kaiser had that alleged purpose. The monthly reports showing each physicians' time loss authorizations bear the message "[p]lease authorize only medically necessary time loss. * * * If the worker can be released to light duty, please do so." Although plaintiff suggests that those words imply that physicians should authorize *less* time loss than medically necessary, nothing in the record supports that interpretation. E-mail messages from Kaiser employees to plaintiff's superiors questioning plaintiff's diagnoses and time loss authorizations likewise do not suffice. The messages suggest that the

articulated any argument that Kaiser's conduct regarding his employment amounted to a denial of medical treatment for covered workers. Accordingly, he has failed to demonstrate that Kaiser used improper means to interfere with his contract with Northwest, and summary judgment for Kaiser was appropriate.

Affirmed.

concerns about time loss were driven by questions of medical appropriateness. They were addressed to plaintiff's superiors—themselves physicians—to resolve medical questions.