Argued and submitted November 12, 1986, affirmed April 22, reconsideration denied
July 2, petition for review denied July 28, 1987 (303 Or 699)

JIM JARVIS-JIM BEAMER, INC.,
*Respondent,*

*v.*

BLACK BEAR RESORT, INC. et al,
*Appellants,*

BLACK BEAR RESORT, INC.,
*Third-Party Plaintiff - Appellant,*

*v.*

JIM JARVIS-JIM BEAMER, INC. et al,
*Third-Party Defendants - Respondents.*

(32508; CA A37188)

735 P2d 1240

William D. Bailey, Portland, argued the cause and filed the briefs for appellants.

Levi J. Smith, Portland, argued the cause and filed the brief for respondents.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendants appeal from a judgment entered on a jury verdict for plaintiff, awarding damages for breach of contract for the marketing of timeshares in a resort located at Sunriver. The only assigned error that requires extended discussion is that the trial court erred in denying defendants' motions for directed verdict, which were made on the ground that plaintiff was not a licensed real estate organization when the alleged cause of action arose.[1] We affirm.

Jim Beamer was approached by representatives of Black Bear in May and June, 1981, for the purpose of working out an arrangement for the marketing of timeshares in Black Bear resort. At that time, Beamer was a licensed real estate broker. He contacted Jarvis, his long time acquaintance, who had been engaged in real estate activity for about seven years,[2] and hired him to assist in promoting the sale of the time-shares, if an agreement could be accomplished. Although the record is not clear as to when Jim Jarvis-Jim Beamer, Inc., was formed, it appears to have been before December 24, 1981, because on that date Beamer applied to the Real Estate Division to transfer his license to that corporation.

The parties entered into a letter of intent dated December 30, 1981, which stated that Beamer and Jarvis were "doing business as an Oregon corporation, Jim Jarvis-Jim Beamer, Inc." and that they desired "to organize a company for the marketing and sales of the timeshare units by qualified real estate salespersons." Each of them signed the letter of intent under the caption "Jarvis & Beamer." Dwain Quandt and Ron Sears signed for Q&S Properties (Q&S), which was to be the owner of Black Bear Resort, a non-profit corporation yet to be organized.

---

[1] Defendants also assign error to the trial court's denial of their motions for directed verdict and judgment *n.o.v.* based on their allegation that plaintiff breached its fiduciary duty to defendants. Any fiduciary duty that plaintiff owed to defendants was the result of the marketing agreement and related dealings between the parties. The dispute over who breached the agreement was a question of fact that was properly submitted to the jury. Because the jury decided in favor of plaintiff, we cannot set the verdict aside unless there is no evidence from which the jury could have found the facts necessary to establish plaintiff's claim. *Brown v. J.C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). There was evidence to support the jury's verdict.

[2] It is not clear whether Jarvis was licensed; however, defendants make nothing of that lack of clarity.

It is apparent from the letter that the parties contemplated that a definitive agreement would be executed after certain preliminary matters were accomplished and some of the details of the timeshare arrangements were settled. Yet the parties set forth in that 10-page document what each party undertook to do to accomplish marketing the interests. Jarvis and Beamer committed themselves or their corporation to spending a minimum of $100,000 to market the initial block of timeshares; they or their corporation were to be the exclusive sales agent for Black Bear, receiving a 30 percent commission on all timeshare sales, and agreed not to sell timeshare interests for any other developer. Q&S agreed to cause its nonprofit corporation to construct eight homes and accompanying recreational facilities for the first phase of the project and to make every effort to construct a total of 46 units in seven phases. Q&S also agreed to arrange for financing on specific terms. The agreement of the parties was subject to "final documentation and necessary governmental agency approval for the marketing" of the timeshares.

Early in 1982, apparently after plaintiff was organized, Beamer and Jarvis began working full time in preparation for marketing the timeshares. They established an office at Sunriver, hired a secretary and a sales staff, purchased office equipment and began working with advertising agencies to develop a marketing campaign. At some point, Beamer began promoting timeshare sales at Sunriver and at various sporting events around the state, although no actual sales could be made until the state had given its approval. On April 6, Beamer's application to transfer his license to plaintiff and to become its designated broker, ORS 696.025(3),[3] was approved.

On May 6, 1982, the Real Estate Division approved

---

[3] ORS 696.025(3) provides:

"The commissioner may issue a real estate license to a real estate licensee in any one of the following categories, which authorizes the licensee to perform only the duties described for that category:

"* * * * *

"(3) Designated real estate broker, which authorizes such person or persons to engage in professional real estate activity directly with others, but limited to activity in the name of a real estate organization designating such person to be a designated real estate broker, and not otherwise."

the plan to sell the timeshares to the public. On the following day, the definitive agreement contemplated by the letter of intent, and denominated a marketing agreement, was executed between Black Bear Resort and Q&S on the one hand and plaintiff on the other. Performance of the agreement was personally guaranteed by the four persons who had signed the letter of intent. The marketing agreement elaborated on the principles initially set out in the letter of intent and contained significant differences; it provided that it superseded the earlier document. Shortly after that agreement was signed, disputes arose between the parties, and on July 2, 1982, defendants terminated it.

Plaintiff then commenced this action for breach of the marketing agreement. The complaint sought to recover money spent "in anticipation and reliance upon the execution of the contract," as well as profits from commissions that would have been earned had the agreement been fulfilled. The jury found no lost profits but awarded plaintiff the amount of money that it had spent "in performance of its obligations on the contract." On appeal, defendants contend that the trial court erred in denying their motions for directed verdict. We view the evidence in the light most favorable to the party opposing the motions. *Brown v. J.C. Penney Co., supra* n 1; *Jacobs v. Tidewater Barge Lines,* 277 Or 809, 811, 562 P2d 545 (1977).

Defendants based their motions on ORS 696.710(1):

"No person engaged in the business of, or acting in the capacity of, a real estate broker or appraiser within this state shall bring or maintain any action in the courts for the collection of compensation without alleging and proving that the person was a duly licensed real estate broker or appraiser at the time the alleged cause of action arose."

Their principal argument is that plaintiff's real estate activities commenced when the letter of intent was signed, at which time it was not licensed. That argument is premised on defendants' contention that plaintiff signed the letter of intent, which is not the case, as we have pointed out.

Their fallback position is that, because plaintiff was not licensed until April 6, 1982, it is prohibited by the statute from suing to recover damages incurred before it became licensed. They did not point out to the trial court exactly what

expenditures were made before that date or the amounts expended or distinguish between those that were "real estate activities" and those that were not. Here, they argue that approximately $109,000 of the expenditures were made before the marketing agreement was signed on May 7, 1982. However, plaintiff was licensed no later than April 6, 1982. Although some of plaintiff's preliminary activities for which recovery is sought come within the definition of "professional real estate activity," ORS 696.010(10),[4] not all of them do. For example, opening an office, hiring personnel and purchasing equipment do not. Beamer, as a licensed broker, could have lawfully engaged in promotional activity.

■     Furthermore, the statute only prohibits actions "for the collection of compensation," defined by ORS 696.010(6):

   " 'Compensation' means any fee, commission, salary, money or valuable consideration for services rendered or to be

---

[4] ORS 696.010(10), so far as relevant, provides:

"As used in ORS 696.010 to 696.490 and 696.710 to 696.730, unless the context requires otherwise:

"* * * * *

"(10) 'Professional real estate activity' means any of the following actions, when engaged in for another and for compensation or with the intention or in the expectation or upon the promise of receiving or collecting compensation, by any person who:

"* * * * *

"(b)     Offers to sell, exchange, purchase, rent or lease real estate.

"(c)     Negotiates, offers, attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of real estate.

"* * * * *

"(j)     Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate.

"* * * * *

"(m)     Except as otherwise provided in ORS 696.030(1)(k), advises, counsels, consults or analyzes in connection with real estate values, sales or dispositions, including dispositions through eminent domain procedures."

There is no dispute but that the definition of "real estate" includes the timeshares that plaintiff intended to sell, ORS 696.010(11), or that plaintiff, at some point, was "acting in the capacity of a real estate broker."

Oregon now has a statutory scheme that regulates the timeshare industry specifically. ORS 94.813 to ORS 94.945 became effective July 28, 1983. Or Laws 1983, ch 530, § 55.

rendered as well as the promise thereof and whether contingent or otherwise."

Expenditures relating to the opening of an office do not come within that definition. However, because plaintiff's complaint seeks money for lost commissions, as well as money spent in anticipation of and in reliance on the execution of the marketing agreement, part of its claim is for "compensation." Therefore, plaintiff was required by ORS 696.710(1) to allege that it was licensed at the time the cause of action arose. It did so by amendment at the close of its case, and no error is assigned to the court's permitting the amendment.

Defendants, nevertheless, contend that plaintiff must have been licensed throughout the time during which compensation is claimed or, as stated in *Hunter v. Cunning,* 176 Or 250, 290, 154 P2d 562, 157 P2d 510 (1944), "the whole period covered by the rendition of the broker's services." Although that is a correct proposition, defendants' motion for directed verdict was premised on the erroneous assumption that plaintiff had signed the letter of intent. Therefore, denial of that motion was not error. In the alternative, they moved to strike any evidence relating to any money that was spent before April 6, when plaintiff became licensed, without specifying what expenditures, or what amounts, were made before that date and moved to dismiss "that part of the case." More specificity is required. ORCP 60. Because some of those preliminary expenditures were not "real estate activities" or "compensation" within the statutory definitions, there was no error in denying the alternative motion.

Affirmed.